(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BERGHUIS, WARDEN *v.* THOMPKINS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 08–1470.   Argued March 1, 2010—Decided June 1, 2010

After advising respondent Thompkins of his rights, in full compliance with *Miranda* v. *Arizona*, 384 U. S. 436, Detective Helgert and another Michigan officer interrogated him about a shooting in which one victim died.  At no point did Thompkins say that he wanted to remain silent, that he did not want to talk with the police, or that he wanted an attorney.  He was largely silent during the 3-hour interrogation, but near the end, he answered "yes" when asked if he prayed to God to forgive him for the shooting.  He moved to suppress his statements, claiming that he had invoked his Fifth Amendment right to remain silent, that he had not waived that right, and that his inculpatory statements were involuntary.  The trial court denied the motion.  At trial on first-degree murder and other charges, the prosecution called Eric Purifoy, who drove the van in which Thompkins and a third accomplice were riding at the time of the shooting, and who had been convicted of firearm offenses but acquitted of murder and assault.  Thompkins' defense was that Purifoy was the shooter. Purifoy testified that he did not see who fired the shots.  During closing arguments, the prosecution suggested that Purifoy lied about not seeing the shooter and pondered whether Purifoy's jury had made the right decision.  Defense counsel did not ask the court to instruct the jury that it could consider evidence of the outcome of Purifoy's trial only to assess his credibility, not to establish Thompkins' guilt.  The jury found Thompkins guilty, and he was sentenced to life in prison without parole.  In denying his motion for a new trial, the trial court rejected as nonprejudicial his ineffective-assistance-of-counsel claim for failure to request a limiting instruction about the outcome of Purifoy's trial.  On appeal, the Michigan Court of Appeals rejected both Thompkins' *Miranda* and his ineffective-assistance claims.  The Fed-

eral District Court denied his subsequent habeas request, reasoning that Thompkins did not invoke his right to remain silent and was not coerced into making statements during the interrogation, and that it was not unreasonable, for purposes of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), see 28 U. S. C. §2254(d)(1), for the State Court of Appeals to determine that he had waived his right to remain silent. The Sixth Circuit reversed, holding that the state court was unreasonable in finding an implied waiver of Thompkins' right to remain silent and in rejecting his ineffective-assistance-of-counsel claim.

*Held*:

  1. The state court's decision rejecting Thompkins' *Miranda* claim was correct under *de novo* review and therefore necessarily reasonable under AEDPA's more deferential standard of review. Pp. 7–17.

    (a) Thompkins' silence during the interrogation did not invoke his right to remain silent. A suspect's *Miranda* right to counsel must be invoked "unambiguously." *Davis* v. *United States*, 512 U. S. 452, 459. If the accused makes an "ambiguous or equivocal" statement or no statement, the police are not required to end the interrogation, *ibid.*, or ask questions to clarify the accused's intent, *id.,* at 461–462. There is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*. Both protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked. The unambiguous invocation requirement results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. *Davis*, *supra*, at 458–459. Had Thompkins said that he wanted to remain silent or that he did not want to talk, he would have invoked his right to end the questioning. He did neither. Pp. 8–10.

    (b) Thompkins waived his right to remain silent when he knowingly and voluntarily made a statement to police. A waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran* v. *Burbine*, 475 U. S. 412, 421. Such a waiver may be "implied" through a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *North Carolina* v. *Butler*, 441 U. S. 369, 373. If the State establishes that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver. The record here shows that Thompkins waived his right to remain silent. First, the lack of any contention

that he did not understand his rights indicates that he knew what he gave up when he spoke. See *Burbine*, *supra*, at 421. Second, his answer to the question about God is a "course of conduct indicating waiver" of that right. *Butler*, *supra*, at 373. Had he wanted to remain silent, he could have said nothing in response or unambiguously invoked his *Miranda* rights, ending the interrogation. That he made a statement nearly three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Third, there is no evidence that his statement was coerced. See *Burbine*, *supra*, at 421. He does not claim that police threatened or injured him or that he was fearful. The interrogation took place in a standard-sized room in the middle of the day, and there is no authority for the proposition that a 3-hour interrogation is inherently coercive. Cf. *Colorado* v. *Connelly*, 479 U. S. 157, 163–164, n. 1. The fact that the question referred to religious beliefs also does not render his statement involuntary. *Id.*, at 170. Pp. 10–15.

(c) Thompkins argues that, even if his answer to Helgert could constitute a waiver of his right to remain silent, the police were not allowed to question him until they first obtained a waiver. However, a rule requiring a waiver at the outset would be inconsistent with *Butler*'s holding that courts can infer a waiver "from the actions and words of the person interrogated." 441 U. S., at 373. Any waiver, express or implied, may be contradicted by an invocation at any time, terminating further interrogation. When the suspect knows that *Miranda* rights can be invoked at any time, he or she can reassess his or her immediate and long-term interests as the interrogation progresses. After giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived *Miranda* rights. Thus, the police were not required to obtain a waiver of Thompkins' *Miranda* rights before interrogating him. Pp. 15–17.

2. Even if his counsel provided ineffective assistance, Thompkins cannot show prejudice under a *de novo* review of this record. To establish ineffective assistance, a defendant "must show both deficient performance and prejudice." *Knowles* v. *Mirzayance*, 556 U. S. \_\_\_, \_\_\_. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland* v. *Washington*, 466 U. S. 668, 694, considering "the totality of the evidence before the judge or jury," *id.*, at 695. Here, the Sixth Circuit did not account for the other evidence presented against Thompkins. The state court rejected his claim that he was prejudiced by evidence of Purifoy's earlier conviction. Even if it used an incorrect legal standard, this Court need not determine whether AEDPA's deferential

standard of review applies here, since Thompkins cannot show preju-
dice under *de novo* review, a more favorable standard for him. *De
novo* review can be used in this case because a habeas petitioner will
not be entitled to relief if his or her claim is rejected on *de novo* re-
view. See §2254(a). Assuming that failure to request a limiting in-
struction here was deficient representation, Thompkins cannot show
prejudice, for the record shows that it was not reasonably likely that
such an instruction would have made any difference in light of other
evidence of guilt. The surviving victim identified Thompkins as the
shooter, and the identification was supported by a surveillance cam-
era photograph. A friend testified that Thompkins confessed to him,
and the details of that confession were corroborated by evidence that
Thompkins stripped and abandoned the van after the shooting. The
jury, moreover, was capable of assessing Purifoy's credibility, as it
was instructed to do. Pp. 17–19.

547 F. 3d 572, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. SOTOMAYOR, J., filed
a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ.,
joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1470

MARY BERGHUIS, WARDEN, PETITIONER *v.* VAN CHESTER THOMPKINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 1, 2010]

JUSTICE KENNEDY delivered the opinion of the Court.

The United States Court of Appeals for the Sixth Circuit, in a habeas corpus proceeding challenging a Michigan conviction for first-degree murder and certain other offenses, ruled that there had been two separate constitutional errors in the trial that led to the jury's guilty verdict. First, the Court of Appeals determined that a statement by the accused, relied on at trial by the prosecution, had been elicited in violation of *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Second, it found that failure to ask for an instruction relating to testimony from an accomplice was ineffective assistance by defense counsel. See *Strickland* v. *Washington*, 466 U. S. 668 (1984). Both of these contentions had been rejected in Michigan courts and in the habeas corpus proceedings before the United States District Court. Certiorari was granted to review the decision by the Court of Appeals on both points. The warden of a Michigan correctional facility is the petitioner here, and Van Chester Thompkins, who was convicted, is the respondent.

# I
## A

On January 10, 2000, a shooting occurred outside a mall in Southfield, Michigan. Among the victims was Samuel Morris, who died from multiple gunshot wounds. The other victim, Frederick France, recovered from his injuries and later testified. Thompkins, who was a suspect, fled. About one year later he was found in Ohio and arrested there.

Two Southfield police officers traveled to Ohio to interrogate Thompkins, then awaiting transfer to Michigan. The interrogation began around 1:30 p.m. and lasted about three hours. The interrogation was conducted in a room that was 8 by 10 feet, and Thompkins sat in a chair that resembled a school desk (it had an arm on it that swings around to provide a surface to write on). App. 144a–145a. At the beginning of the interrogation, one of the officers, Detective Helgert, presented Thompkins with a form derived from the *Miranda* rule. It stated:

> "NOTIFICATION OF CONSTITUTIONAL RIGHTS
> AND STATEMENT
> "1. You have the right to remain silent.
> "2. Anything you say can and will be used against you in a court of law.
> "3. You have a right to talk to a lawyer before answering any questions and you have the right to have a lawyer present with you while you are answering any questions.
> "4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
> "5. You have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned." Brief for Petitioner 60 (some capi-

talization omitted).

Helgert asked Thompkins to read the fifth warning out loud. App. 8a. Thompkins complied. Helgert later said this was to ensure that Thompkins could read, and Helgert concluded that Thompkins understood English. *Id.*, at 9a. Helgert then read the other four *Miranda* warnings out loud and asked Thompkins to sign the form to demonstrate that he understood his rights. App. 8a–9a. Thompkins declined to sign the form. The record contains conflicting evidence about whether Thompkins then verbally confirmed that he understood the rights listed on the form. Compare *id.*, at 9a (at a suppression hearing, Helgert testified that Thompkins verbally confirmed that he understood his rights), with *id.*, at 148a (at trial, Helgert stated, "I don't know that I orally asked him" whether Thompkins understood his rights).

Officers began an interrogation. At no point during the interrogation did Thompkins say that he wanted to remain silent, that he did not want to talk with the police, or that he wanted an attorney. *Id.*, at 10a. Thompkins was "[l]argely" silent during the interrogation, which lasted about three hours. *Id.*, at 19a. He did give a few limited verbal responses, however, such as "yeah," "no," or "I don't know." And on occasion he communicated by nodding his head. *Id.*, at 23a. Thompkins also said that he "didn't want a peppermint" that was offered to him by the police and that the chair he was "sitting in was hard." *Id.*, at 152a.

About 2 hours and 45 minutes into the interrogation, Helgert asked Thompkins, "Do you believe in God?" *Id.*, at 11a, 153a. Thompkins made eye contact with Helgert and said "Yes," as his eyes "well[ed] up with tears." *Id.*, at 11a. Helgert asked, "Do you pray to God?" Thompkins said "Yes." *Id.*, at 11a, 153a. Helgert asked, "Do you pray to God to forgive you for shooting that boy down?" *Id.*, at

153a. Thompkins answered "Yes" and looked away. *Ibid.*
Thompkins refused to make a written confession, and the
interrogation ended about 15 minutes later. *Id.*, at 11a.

Thompkins was charged with first-degree murder,
assault with intent to commit murder, and certain fire-
arms-related offenses. He moved to suppress the state-
ments made during the interrogation. He argued that he
had invoked his Fifth Amendment right to remain silent,
requiring police to end the interrogation at once, see
*Michigan* v. *Mosley*, 423 U. S. 96, 103 (1975) (citing
*Miranda*, 384 U. S., at 474), that he had not waived his
right to remain silent, and that his inculpatory statements
were involuntary. The trial court denied the motion.

At trial, the prosecution's theory was that Thompkins
shot the victims from the passenger seat of a van driven
by Eric Purifoy. Purifoy testified that he had been driving
the van and that Thompkins was in the passenger seat
while another man, one Myzell Woodward, was in the
back. The defense strategy was to pin the blame on Puri-
foy. Purifoy testified he did not see who fired the weapon
because the van was stopped and he was bending over
near the floor when shots were fired. Purifoy explained
that, just after the shooting, Thompkins, holding a pistol,
told Purifoy, "What the hell you doing? Pull off." Purifoy
then drove away from the scene. App. 170a.

So that the Thompkins jury could assess Purifoy's credi-
bility and knowledge, the prosecution elicited testimony
from Purifoy that he had been tried earlier for the shoot-
ing under an aiding-and-abetting theory. Purifoy and
Detective Helgert testified that a jury acquitted him of the
murder and assault charges, convicted him of carrying a
concealed weapon in a motor vehicle, and hung on two
other firearms offenses to which he later pleaded guilty.
At Purifoy's trial, the prosecution had argued that Purifoy
was the driver and Thompkins was the shooter. This was
consistent with the prosecution's argument at Thomp-

kins's trial.

After Purifoy's trial had ended—but before Thompkins's trial began—Purifoy sent Thompkins some letters. The letters expressed Purifoy's disappointment that Thompkins's family thought Purifoy was a "snitch" and a "rat." *Id.*, at 179a–180a. In one letter Purifoy offered to send a copy of his trial transcript to Thompkins as proof that Purifoy did not place the blame on Thompkins for the shooting. *Id.*, at 180a. The letters also contained statements by Purifoy that claimed they were both innocent. *Id.*, at 178a–179a. At Thompkins's trial, the prosecution suggested that one of Purifoy's letters appeared to give Thompkins a trial strategy. It was, the prosecution suggested, that Woodward shot the victims, allowing Purifoy and Thompkins to say they dropped to the floor when the shooting started. *Id.*, at 187a–189a.

During closing arguments, the prosecution suggested that Purifoy lied when he testified that he did not see Thompkins shoot the victims:

> "Did Eric Purifoy's Jury make the right decision? I'm not here to judge that. You are not bound by what his Jury found. Take his testimony for what it was, [a] twisted attempt to help not just an acquaintance but his tight buddy." *Id.*, at 202a.

Defense counsel did not object. Defense counsel also did not ask for an instruction informing the jury that it could consider evidence of the outcome of Purifoy's trial only to assess Purifoy's credibility, not to establish Thompkins's guilt.

The jury found Thompkins guilty on all counts. He was sentenced to life in prison without parole.

## B

The trial court denied a motion for new trial filed by Thompkins's appellate counsel. The trial court rejected

the claim of ineffective assistance of trial counsel for fail-
ure to ask for a limiting instruction regarding the outcome
of Purifoy's trial, reasoning that this did not prejudice
Thompkins. *Id.*, at 236a.

Thompkins appealed this ruling, along with the trial
court's refusal to suppress his pretrial statements under
*Miranda*. The Michigan Court of Appeals rejected the
*Miranda* claim, ruling that Thompkins had not invoked
his right to remain silent and had waived it. It also re-
jected the ineffective-assistance-of-counsel claim, finding
that Thompkins failed to show that evidence of Purifoy's
conviction for firearms offenses resulted in prejudice. App.
to Pet. for Cert. 74a–82a. The Michigan Supreme Court
denied discretionary review. 471 Mich. 866, 683 N. W. 2d
676 (2004) (table).

Thompkins filed a petition for a writ of habeas corpus in
the United States District Court for the Eastern District of
Michigan. The District Court rejected Thompkins's
*Miranda* and ineffective-assistance claims. App. to Pet.
for Cert. 39a–72a. It noted that, under the Antiterrorism
and Effective Death Penalty Act of 1996 (AEDPA), a fed-
eral court cannot grant a petition for a writ of habeas
corpus unless the state court's adjudication of the merits
was "contrary to, or involved an unreasonable application
of, clearly established Federal law." 28 U. S. C.
§2254(d)(1). The District Court reasoned that Thompkins
did not invoke his right to remain silent and was not
coerced into making statements during the interrogation.
It held further that the Michigan Court of Appeals was not
unreasonable in determining that Thompkins had waived
his right to remain silent.

The United States Court of Appeals for the Sixth Circuit
reversed, ruling for Thompkins on both his *Miranda* and
ineffective-assistance-of-counsel claims. 547 F. 3d 572
(2008). The Court of Appeals ruled that the state court, in
rejecting Thompkins's *Miranda* claim, unreasonably ap-

plied clearly established federal law and based its decision on an unreasonable determination of the facts. See 28 U. S. C. §2254(d). The Court of Appeals acknowledged that a waiver of the right to remain silent need not be express, as it can be "'inferred from the actions and words of the person interrogated.'" 547 F. 3d, at 582 (quoting *North Carolina* v. *Butler*, 441 U. S. 369, 373 (1979)). The panel held, nevertheless, that the state court was unreasonable in finding an implied waiver in the circumstances here. The Court of Appeals found that the state court unreasonably determined the facts because "the evidence demonstrates that Thompkins was silent for two hours and forty-five minutes." 547 F. 3d, at 586. According to the Court of Appeals, Thompkins's "persistent silence for nearly three hours in response to questioning and repeated invitations to tell his side of the story offered a clear and unequivocal message to the officers: Thompkins did not wish to waive his rights." *Id.*, at 588.

The Court of Appeals next determined that the state court unreasonably applied clearly established federal law by rejecting Thompkins's ineffective-assistance-of-counsel claim based on counsel's failure to ask for a limiting instruction regarding Purifoy's acquittal. The Court of Appeals asserted that because Thompkins's central strategy was to pin the blame on Purifoy, there was a reasonable probability that the result of Thompkins's trial would have been different if there had been a limiting instruction regarding Purifoy's acquittal.

We granted certiorari. 557 U. S. \_\_\_ (2009).

## II

Under AEDPA, a federal court may not grant a habeas corpus application "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U. S. C. §2254(d), unless the state court's decision "was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," §2254(d)(2). See *Knowles* v. *Mirzayance*, 556 U. S. ___, ___ (2009) (slip op., at 1). The relevant state-court decision here is the Michigan Court of Appeals' decision affirming Thompkins's conviction and rejecting his *Miranda* and ineffective-assistance-of-counsel claims on the merits.

## III

The *Miranda* Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation. The substance of the warning still must be given to suspects today. A suspect in custody must be advised as follows:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U. S., at 479.

All concede that the warning given in this case was in full compliance with these requirements. The dispute centers on the response—or nonresponse—from the suspect.

## A

Thompkins makes various arguments that his answers to questions from the detectives were inadmissible. He first contends that he "invoke[d] his privilege" to remain silent by not saying anything for a sufficient period of time, so the interrogation should have "cease[d]" before he made his inculpatory statements. *Id.*, at 474; see *Mosley*, 423 U. S., at 103 (police must "'scrupulously hono[r]'" this

"critical safeguard" when the accused invokes his or her "'right to cut off questioning'" (quoting *Miranda*, *supra*, at 474, 479)).

This argument is unpersuasive. In the context of invoking the *Miranda* right to counsel, the Court in *Davis* v. *United States*, 512 U. S. 452, 459 (1994), held that a suspect must do so "unambiguously." If an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation, *ibid.*, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights, 512 U. S., at 461–462.

The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, but there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*. See, *e.g., Solem* v. *Stumes*, 465 U. S. 638, 648 (1984) ("[M]uch of the logic and language of *[Mosley]*," which discussed the *Miranda* right to remain silent, "could be applied to the invocation of the [*Miranda* right to counsel]"). Both protect the privilege against compulsory self-incrimination, *Miranda*, *supra*, at 467– 473, by requiring an interrogation to cease when either right is invoked, *Mosley*, *supra*, at 103 (citing *Miranda*, *supra*, at 474); *Fare* v. *Michael C.*, 442 U. S. 707, 719 (1979).

There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. *Davis*, 512 U. S., at 458–459. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about

an accused's unclear intent and face the consequence of suppression "if they guess wrong." *Id.*, at 461. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. See *id.*, at 459–461; *Moran* v. *Burbine*, 475 U. S. 412, 427 (1986). Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights "might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation." *Burbine*, 475 U. S., at 425. But "as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.*, at 427; see *Davis*, *supra*, at 460.

Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his "'right to cut off questioning.'" *Mosley*, *supra*, at 103 (quoting *Miranda*, *supra*, at 474). Here he did neither, so he did not invoke his right to remain silent.

B

We next consider whether Thompkins waived his right to remain silent. Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily waived *[Miranda]* rights" when making the statement. *Butler*, 441 U. S., at 373. The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, *supra*, at 421.

Some language in *Miranda* could be read to indicate that waivers are difficult to establish absent an explicit written waiver or a formal, express oral statement. *Miranda* said "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U. S., at 475; see *id.*, at 470 ("No effective waiver . . . can be recognized unless specifically made after the *[Miranda]* warnings . . . have been given"). In addition, the *Miranda* Court stated that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*, at 475.

The course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered. Cf. Fed. Rule Crim. Proc. 11. The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel. See *Davis*, *supra*, at 460; *Burbine*, *supra*, at 427. Thus, "[i]f anything, our subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement while reaffirming the decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief." *Dickerson* v. *United States*, 530 U. S. 428, 443–444 (2000).

One of the first cases to decide the meaning and import of *Miranda* with respect to the question of waiver was *North Carolina* v. *Butler*. The *Butler* Court, after discussing some of the problems created by the language in *Miranda*, established certain important propositions. *Butler* interpreted the *Miranda* language concerning the

"heavy burden" to show waiver, 384 U. S., at 475, in accord with usual principles of determining waiver, which can include waiver implied from all the circumstances. See *Butler, supra,* at 373, 376. And in a later case, the Court stated that this "heavy burden" is not more than the burden to establish waiver by a preponderance of the evidence. *Colorado* v. *Connelly,* 479 U. S. 157, 168 (1986).

The prosecution therefore does not need to show that a waiver of *Miranda* rights was express. An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence. *Butler, supra,* at 376. *Butler* made clear that a waiver of *Miranda* rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." 441 U. S., at 373. The Court in *Butler* therefore "retreated" from the "language and tenor of the *Miranda* opinion," which "suggested that the Court would require that a waiver . . . be 'specifically made.'" *Connecticut* v. *Barrett,* 479 U. S. 523, 531–532 (1987) (Brennan, J., concurring in judgment).

If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" of *Miranda* rights. *Miranda, supra,* at 475. The prosecution must make the additional showing that the accused understood these rights. See *Colorado* v. *Spring,* 479 U. S. 564, 573–575 (1987); *Barrett, supra,* at 530; *Burbine, supra,* at 421–422. Cf. *Tague* v. *Louisiana,* 444 U. S. 469, 469, 471 (1980) *(per curiam)* (no evidence that accused understood his *Miranda* rights); *Carnley* v. *Cochran,* 369 U. S. 506, 516 (1962) (government could not show that accused "understandingly" waived his right to counsel in light of "silent record"). Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain

silent.

Although *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning, see *Burbine*, 475 U. S., at 427, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford. See, *e.g., Butler*, *supra*, at 372–376; *Connelly*, *supra*, at 169–170 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the [due process] confession context"). The Court's cases have recognized that a waiver of *Miranda* rights need only meet the standard of *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). See *Butler*, *supra*, at 374–375; *Miranda*, *supra*, at 475–476 (applying *Zerbst* standard of intentional relinquishment of a known right). As *Butler* recognized, 441 U. S., at 375–376, *Miranda* rights can therefore be waived through means less formal than a typical waiver on the record in a courtroom, cf. Fed. Rule Crim. Proc. 11, given the practical constraints and necessities of interrogation and the fact that *Miranda*'s main protection lies in advising defendants of their rights, see *Davis*, 512 U. S., at 460; *Burbine*, 475 U. S., at 427.

The record in this case shows that Thompkins waived his right to remain silent. There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak. First, there is no contention that Thompkins did not understand his rights; and from this it follows that he knew what he gave up when he spoke. See *id.*, at 421. There was more than enough evidence in the record to conclude that Thompkins under-

stood his *Miranda* rights. Thompkins received a written copy of the *Miranda* warnings; Detective Helgert determined that Thompkins could read and understand English; and Thompkins was given time to read the warnings. Thompkins, furthermore, read aloud the fifth warning, which stated that "you have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned." Brief for Petitioner 60 (capitalization omitted). He was thus aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation. Those rights, the warning made clear, could be asserted at any time. Helgert, moreover, read the warnings aloud.

Second, Thompkins's answer to Detective Helgert's question about whether Thompkins prayed to God for forgiveness for shooting the victim is a "course of conduct indicating waiver" of the right to remain silent. *Butler*, *supra*, at 373. If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to rewarn suspects from time to time. Thompkins's answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver. This is confirmed by the fact that before then Thompkins had given sporadic answers to questions throughout the interrogation.

Third, there is no evidence that Thompkins's statement was coerced. See *Burbine*, *supra*, at 421. Thompkins does

not claim that police threatened or injured him during the interrogation or that he was in any way fearful. The interrogation was conducted in a standard-sized room in the middle of the afternoon. It is true that apparently he was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats. Cf. *Connelly*, 479 U. S., at 163–164, n. 1. The fact that Helgert's question referred to Thompkins's religious beliefs also did not render Thompkins's statement involuntary. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.*, at 170 (quoting *Oregon* v. *Elstad*, 470 U. S. 298, 305 (1985)). In these circumstances, Thompkins knowingly and voluntarily made a statement to police, so he waived his right to remain silent.

C

Thompkins next argues that, even if his answer to Detective Helgert could constitute a waiver of his right to remain silent, the police were not allowed to question him until they obtained a waiver first. *Butler* forecloses this argument. The *Butler* Court held that courts can infer a waiver of *Miranda* rights "from the actions and words of the person interrogated." 441 U. S., at 373. This principle would be inconsistent with a rule that requires a waiver at the outset. The *Butler* Court thus rejected the rule proposed by the *Butler* dissent, which would have "requir[ed] the police to obtain an express waiver of [*Miranda* rights] before proceeding with interrogation." *Id.*, at 379 (Brennan, J., dissenting). This holding also makes sense given

that "the primary protection afforded suspects subject[ed] to custodial interrogation is the *Miranda* warnings themselves." *Davis*, 512 U. S., at 460. The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions. Any waiver, express or implied, may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease.

Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that *Miranda* rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests. Cooperation with the police may result in more favorable treatment for the suspect; the apprehension of accomplices; the prevention of continuing injury and fear; beginning steps towards relief or solace for the victims; and the beginning of the suspect's own return to the law and the social order it seeks to protect.

In order for an accused's statement to be admissible at trial, police must have given the accused a *Miranda* warning. See *Miranda*, 384 U. S., at 471. If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of *Miranda* rights. *Id.*, at 476. In making its ruling on the admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been estab-

lished. Thus, after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights. On these premises, it follows the police were not required to obtain a waiver of Thompkins's *Miranda* rights before commencing the interrogation.

D

In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police. Thompkins did not invoke his right to remain silent and stop the questioning. Understanding his rights in full, he waived his right to remain silent by making a voluntary statement to the police. The police, moreover, were not required to obtain a waiver of Thompkins's right to remain silent before interrogating him. The state court's decision rejecting Thompkins's *Miranda* claim was thus correct under *de novo* review and therefore necessarily reasonable under the more deferential AEDPA standard of review, 28 U. S. C. §2254(d). See *Knowles*, 556 U. S., at \_\_\_ (slip op., at 11) (state court's decision was correct under *de novo* review and not unreasonable under AEDPA).

IV

The second issue in this case is whether Thompkins's counsel provided ineffective assistance by failing to request a limiting instruction regarding how the jury could consider the outcome of Purifoy's trial. To establish ineffective assistance of counsel, a defendant "must show both deficient performance and prejudice." *Id.*, at \_\_\_ (slip op., at 10) (citing *Strickland*, 466 U. S., at 687). To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been dif-

ferent." *Strickland*, 466 U. S., at 694. In assessing preju-
dice, courts "must consider the totality of the evidence
before the judge or jury." *Id.*, at 695. The Court of Ap-
peals, however, neglected to take into account the other
evidence presented against Thompkins.

The Court of Appeals determined that the state court
was unreasonable, 28 U. S. C. §2254(d), when it found that
Thompkins suffered no prejudice from failure of defense
counsel to request an instruction regarding Purifoy's
earlier acquittal of the murder and assault charges. The
state court had rejected Thompkins's claim that he was
prejudiced by evidence of Purifoy's earlier conviction for
firearms offenses, noting that "the record does not disclose
an attempt to argue that conviction for an improper pur-
pose." App. to Pet. for Cert. 80a. It is unclear what preju-
dice standard the state court applied. The Court of Ap-
peals ruled that the state court used the incorrect
standard for assessing prejudice under *Strickland* because
"[q]uestions of the prosecution's purpose or intent are
completely irrelevant in analyzing whether an error re-
sulted in prejudice, which by definition concerns the er-
ror's effect upon the outcome." 547 F. 3d, at 591–592
(emphasis deleted).

Even if the state court used an incorrect legal standard,
we need not determine whether AEDPA's deferential
standard of review, 28 U. S. C. §2254(d), applies in this
situation. Cf. *Williams* v. *Taylor*, 529 U. S. 362, 397–398
(2000). That is because, even if AEDPA deference does not
apply, Thompkins cannot show prejudice under *de novo*
review, the more favorable standard of review for Thomp-
kins. Courts cannot grant writs of habeas corpus under
§2254 by engaging only in *de novo* review when it is un-
clear whether AEDPA deference applies, §2254(d). In
those situations, courts must resolve whether AEDPA
deference applies, because if it does, a habeas petitioner
may not be entitled to a writ of habeas corpus under

§2254(d). Courts can, however, deny writs of habeas corpus under §2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see §2254(a).

It seems doubtful that failure to request the instruction about the earlier acquittal or conviction was deficient representation; but on the assumption that it was, on this record Thompkins cannot show prejudice. The record establishes that it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt. The surviving victim, Frederick France, identified Thompkins as the shooter, and the identification was supported by a photograph taken from a surveillance camera. Thompkins's friend Omar Stephens testified that Thompkins confessed to him during a phone conversation, and the details of that confession were corroborated by evidence that Thompkins stripped the van and abandoned it after the shooting. The jury, moreover, was capable of assessing Purifoy's credibility, as it was instructed to do. The jury in Thompkins's case could have concluded that the earlier jury in Purifoy's case made a mistake, or alternatively, that Purifoy was not in fact guilty of the crime for which he had been charged. There was ample evidence in the record to support Thompkins's guilt under either theory, and his jury was instructed to weigh all of the evidence in determining whether there was guilt beyond a reasonable doubt. Under our *de novo* review of this record, Thompkins cannot show prejudice.

\*  \*  \*

The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to deny the petition.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1470

_____

## MARY BERGHUIS, WARDEN, PETITIONER *v*. VAN CHESTER THOMPKINS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 1, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The Court concludes today that a criminal suspect waives his right to remain silent if, after sitting tacit and uncommunicative through nearly three hours of police interrogation, he utters a few one-word responses. The Court also concludes that a suspect who wishes to guard his right to remain silent against such a finding of "waiver" must, counterintuitively, speak—and must do so with sufficient precision to satisfy a clear-statement rule that construes ambiguity in favor of the police. Both propositions mark a substantial retreat from the protection against compelled self-incrimination that *Miranda* v. *Arizona*, 384 U. S. 436 (1966), has long provided during custodial interrogation. The broad rules the Court announces today are also troubling because they are unnecessary to decide this case, which is governed by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. §2254(d). Because I believe Thompkins is entitled to relief under AEDPA on the ground that his statements were admitted at trial without the prosecution having carried its burden to show that he waived his right to remain silent; because longstanding principles of judicial restraint counsel leaving for another day the questions of

law the Court reaches out to decide; and because the Court's answers to those questions do not result from a faithful application of our prior decisions, I respectfully dissent.

I

We granted certiorari to review the judgment of the Court of Appeals for the Sixth Circuit, which held that Thompkins was entitled to habeas relief under both *Miranda* and *Strickland* v. *Washington*, 466 U. S. 668 (1984). 547 F. 3d 572 (2008). As to the *Miranda* claims, Thompkins argues first that through his conduct during the 3-hour custodial interrogation he effectively invoked his right to remain silent, requiring police to cut off questioning in accordance with *Miranda* and *Michigan* v. *Mosley*, 423 U. S. 96 (1975). Thompkins also contends his statements were in any case inadmissible because the prosecution failed to meet its heavy burden under *Miranda* of proving that he knowingly and intelligently waived his right to remain silent. The Sixth Circuit agreed with Thompkins as to waiver and declined to reach the question of invocation. 547 F. 3d, at 583–584, n. 4. In my view, even if Thompkins cannot prevail on his invocation claim under AEDPA, he is entitled to relief as to waiver. Because I would affirm the judgment of the Sixth Circuit on that ground, I would not reach Thompkins' claim that he received constitutionally ineffective assistance of counsel.

The strength of Thompkins' *Miranda* claims depends in large part on the circumstances of the 3-hour interrogation, at the end of which he made inculpatory statements later introduced at trial. The Court's opinion downplays record evidence that Thompkins remained almost completely silent and unresponsive throughout that session. One of the interrogating officers, Detective Helgert, testified that although Thompkins was administered *Miranda*

warnings, the last of which he read aloud, Thompkins expressly declined to sign a written acknowledgment that he had been advised of and understood his rights. There is conflicting evidence in the record about whether Thompkins ever verbally confirmed understanding his rights.[1] The record contains no indication that the officers sought or obtained an express waiver.

As to the interrogation itself, Helgert candidly characterized it as "very, very one-sided" and "nearly a monologue." App. 10a, 17a. Thompkins was "[p]eculiar," "[s]ullen," and "[g]enerally quiet." *Id.,* at 149a. Helgert and his partner "did most of the talking," as Thompkins was "not verbally communicative" and "[l]argely" remained silent. *Id.,* at 149a, 17a, 19a. To the extent Thompkins gave any response, his answers consisted of "a word or two. A 'yeah,' or a 'no,' or 'I don't know.' . . . And sometimes . . . he simply sat down . . . with [his] head in [his] hands looking down. Sometimes . . . he would look up and make eye-contact would be the only response." *Id.,* at 23a–24a. After proceeding in this fashion for approximately 2 hours and 45 minutes, Helgert asked Thompkins three questions relating to his faith in God. The prosecution relied at trial on Thompkins' one-word answers of "yes." See *id.,* at 10a–11a.

Thompkins' nonresponsiveness is particularly striking in the context of the officers' interview strategy, later

—————

[1] At the suppression hearing, Detective Helgert testified that after reading Thompkins the warnings, "I believe I asked him if he understood the Rights, and I think I got a verbal answer to that as a 'yes.'" App. 9a. In denying the motion to suppress, the trial court relied on that factual premise. *Id.,* at 26a. In his later testimony at trial, Helgert remembered the encounter differently. Asked whether Thompkins "indicate[d] that he understood [the warnings]" after they had been read, Helgert stated "I don't know that I orally asked him that question." *Id.,* at 148a. Nevertheless, the Michigan Court of Appeals stated that Thompkins verbally acknowledged understanding his rights. App. to Pet. for Cert. 75a.

explained as conveying to Thompkins that "this was his opportunity to explain his side [of the story]" because "[e]verybody else, including [his] co-[d]efendants, had given their version," and asking him "[w]ho is going to speak up for you if you don't speak up for yourself?" *Id.,* at 10a, 21a. Yet, Helgert confirmed that the "*only* thing [Thompkins said] relative to his involvement [in the shooting]" occurred near the end of the interview—*i.e.,* in response to the questions about God. *Id.,* at 10a–11a (emphasis added). The only other responses Helgert could remember Thompkins giving were that "'[h]e didn't want a peppermint'" and "'the chair that he was sitting in was hard.'" *Id.,* at 152a. Nevertheless, the Michigan court concluded on this record that Thompkins had not invoked his right to remain silent because "he continued to talk with the officer, albeit sporadically," and that he voluntarily waived that right. App. to Pet. for Cert. 75a.

Thompkins' federal habeas petition is governed by AEDPA, under which a federal court may not grant the writ unless the state court's adjudication of the merits of the claim at issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §§2254(d)(1), (2).

The relevant clearly established federal law for purposes of §2254(d)(1) begins with our landmark *Miranda* decision, which "g[a]ve force to the Constitution's protection against compelled self-incrimination" by establishing "'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation,'" *Florida* v. *Powell*, 559 U. S. ___, ___–___ (2010) (slip op., at 7–8) (quoting *Duckworth* v. *Eagan*, 492 U. S. 195, 201 (1989)). *Miranda* prescribed the now-familiar

warnings that police must administer prior to questioning. See 384 U. S., at 479; *ante*, at 8. *Miranda* and our subsequent cases also require police to "respect the accused's decision to exercise the rights outlined in the warnings." *Moran* v. *Burbine*, 475 U. S. 412, 420 (1986). "If [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent" or if he "states that he wants an attorney," the interrogation "must cease." 384 U. S., at 473–474.

Even when warnings have been administered and a suspect has not affirmatively invoked his rights, statements made in custodial interrogation may not be admitted as part of the prosecution's case in chief "unless and until" the prosecution demonstrates that an individual "knowingly and intelligently waive[d] [his] rights." *Id.,* at 479; accord, *ante*, at 10. "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U. S., at 475. The government must satisfy the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson* v. *Zerbst*, 304 U. S. 458 (1938)." *Ibid.*

The question whether a suspect has validly waived his right is "entirely distinct" as a matter of law from whether he invoked that right. *Smith* v. *Illinois*, 469 U. S. 91, 98 (1984) *(per curiam)*. The questions are related, however, in terms of the practical effect on the exercise of a suspect's rights. A suspect may at any time revoke his prior waiver of rights—or, closer to the facts of this case, guard against the possibility of a future finding that he implicitly waived his rights—by invoking the rights and thereby requiring the police to cease questioning. Accord, *ante*, at 16.

## II
## A

Like the Sixth Circuit, I begin with the question whether Thompkins waived his right to remain silent. Even if Thompkins did not invoke that right, he is entitled to relief because Michigan did not satisfy its burden of establishing waiver.

*Miranda*'s discussion of the prosecution's burden in proving waiver speaks with particular clarity to the facts of this case and therefore merits reproducing at length:

> "If [an] interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . . Since the State is responsible for establishing the isolated circumstances under which [an] interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

> "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U. S., at 475.

*Miranda* went further in describing the facts likely to satisfy the prosecution's burden of establishing the admissibility of statements obtained after a lengthy interrogation:

> "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a

statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege." *Id.,* at 476.

This Court's decisions subsequent to *Miranda* have emphasized the prosecution's "heavy burden" in proving waiver. See, *e.g., Tague* v. *Louisiana*, 444 U. S. 469, 470–471 (1980) *(per curiam); Fare* v. *Michael C.*, 442 U. S. 707, 724 (1979). We have also reaffirmed that a court may not presume waiver from a suspect's silence or from the mere fact that a confession was eventually obtained. See *North Carolina* v. *Butler*, 441 U. S. 369, 373 (1979).

Even in concluding that *Miranda* does not invariably require an express waiver of the right to silence or the right to counsel, this Court in *Butler* made clear that the prosecution bears a substantial burden in establishing an implied waiver. The Federal Bureau of Investigation had obtained statements after advising Butler of his rights and confirming that he understood them. When presented with a written waiver-of-rights form, Butler told the agents, "'I will talk to you but I am not signing any form.'" 441 U. S., at 371. He then made inculpatory statements, which he later sought to suppress on the ground that he had not expressly waived his right to counsel.

Although this Court reversed the state-court judgment concluding that the statements were inadmissible, we quoted at length portions of the *Miranda* opinion reproduced above. We cautioned that even an "express written or oral statement of waiver of the right to remain silent or of the right to counsel" is not "inevitably . . . sufficient to establish waiver," emphasizing that "[t]he question is . . .

whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." 441 U. S., at 373. *Miranda*, we observed, "unequivocally said . . . mere silence is not enough." 441 U. S., at 373. While we stopped short in *Butler* of announcing a *per se* rule that "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights," we reiterated that "courts must presume that a defendant did not waive his rights; the prosecution's burden is great." *Ibid.*[2]

Rarely do this Court's precedents provide clearly established law so closely on point with the facts of a particular case. Together, *Miranda* and *Butler* establish that a court "must presume that a defendant did not waive his right[s]"; the prosecution bears a "heavy burden" in attempting to demonstrate waiver; the fact of a "lengthy interrogation" prior to obtaining statements is "strong evidence" against a finding of valid waiver; "mere silence" in response to questioning is "not enough"; and waiver may not be presumed "simply from the fact that a confession was in fact eventually obtained." *Miranda, supra*, at 475–476; *Butler, supra*, at 372–373.[3]

---

[2] The Court cites *Colorado* v. *Connelly*, 479 U. S. 157, 168 (1986), for the proposition that the prosecution's "'heavy burden'" under *Miranda* "is not more than the burden to establish waiver by a preponderance of the evidence." *Ante*, at 12. *Connelly* did reject a clear and convincing evidence standard of proof in favor of a preponderance burden. But nothing in *Connelly* displaced the core presumption against finding a waiver of rights, and we have subsequently relied on *Miranda*'s characterization of the prosecution's burden as "heavy." See *Arizona* v. *Roberson*, 486 U. S. 675, 680 (1988).

[3] Likely reflecting the great weight of the prosecution's burden in proving implied waiver, many contemporary police training resources instruct officers to obtain a waiver of rights prior to proceeding at all with an interrogation. See, *e.g.,* F. Inbau, J. Reid, J. Buckley, & B. Jayne, Criminal Interrogation and Confessions 491 (4th ed. 2004)

It is undisputed here that Thompkins never expressly waived his right to remain silent. His refusal to sign even an acknowledgment that he understood his *Miranda* rights evinces, if anything, an intent not to waive those rights. Cf. *United States* v. *Plugh*, 576 F. 3d 135, 142 (CA2 2009) (suspect's refusal to sign waiver-of-rights form "constituted an unequivocally negative answer to the question . . . whether he was willing to waive his rights"). That Thompkins did not make the inculpatory statements at issue until after approximately 2 hours and 45 minutes of interrogation serves as "strong evidence" against waiver. *Miranda* and *Butler* expressly preclude the possibility that the inculpatory statements themselves are sufficient to establish waiver.

In these circumstances, Thompkins' "actions and words" preceding the inculpatory statements simply do not evidence a "course of conduct indicating waiver" sufficient to carry the prosecution's burden. See *Butler*, *supra*, at 373.[4]

―――――――――

(hereinafter Inbau) ("Once [a] waiver is given, the police may proceed with the interrogation"); D. Zulawski & D. Wicklander, Practical Aspects of Interview and Interrogation 55 (2d ed. 2002) ("Only upon the waiver of th[e] *[Miranda]* rights by the suspect can an interrogation occur"); see also Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 11–12 (hereinafter NACDL brief) (collecting authorities).

[4] Although such decisions are not controlling under AEDPA, it is notable that lower courts have similarly required a showing of words or conduct beyond inculpatory statements. See, *e.g., United States* v. *Wallace*, 848 F. 2d 1464, 1475 (CA9 1988) (no implied waiver when warned suspect "maintained her silence for . . . perhap[s] as many as ten minutes" before answering a question); *McDonald* v. *Lucas*, 677 F. 2d 518, 521–522 (CA5 1982) (no implied waiver when defendant refused to sign waiver and there was "no evidence of words or actions implying a waiver, except the [inculpatory] statement"). Generally, courts have found implied waiver when a warned suspect has made incriminating statements "as part of a steady stream of speech or as part of a back-and-forth conversation with the police," or when a warned suspect who previously invoked his right "spontaneously recommences the dialogue with his interviewers." *Bui* v. *DiPaolo*, 170

Although the Michigan court stated that Thompkins "sporadically" participated in the interview, App. to Pet. for Cert. 75a, that court's opinion and the record before us are silent as to the subject matter or context of even a single question to which Thompkins purportedly responded, other than the exchange about God and the statements respecting the peppermint and the chair. Unlike in *Butler*, Thompkins made no initial declaration akin to "I will talk to you." See also 547 F. 3d, at 586–587 (case below) (noting that the case might be different if the record showed Thompkins had responded affirmatively to an invitation to tell his side of the story or described any particular question that Thompkins answered). Indeed, Michigan and the United States concede that no waiver occurred in this case until Thompkins responded "yes" to the questions about God. See Tr. of Oral Arg. 7, 30. I believe it is objectively unreasonable under our clearly established precedents to conclude the prosecution met its "heavy burden" of proof on a record consisting of three one-word answers, following 2 hours and 45 minutes of silence punctuated by a few largely nonverbal responses to unidentified questions.

## B

Perhaps because our prior *Miranda* precedents so clearly favor Thompkins, the Court today goes beyond AEDPA's deferential standard of review and announces a new general principle of law. Any new rule, it must be emphasized, is unnecessary to the disposition of this case.

---

F. 3d 232, 240 (CA1 1999) (citation and internal quotation marks omitted); see also *United States* v. *Smith*, 218 F. 3d 777, 781 (CA7 2000) (implied waiver where suspect "immediately began talking to the agents after refusing to sign the waiver form and continued to do so for an hour"); *United States* v. *Scarpa*, 897 F. 2d 63, 68 (CA2 1990) (implied waiver where warned suspect engaged in a "'relaxed and friendly'" conversation with officers during a 2-hour drive).

If, in the Court's view, the Michigan court did not unreasonably apply our *Miranda* precedents in denying Thompkins relief, it should simply say so and reverse the Sixth Circuit's judgment on that ground. "It is a fundamental rule of judicial restraint . . . that this Court will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 157 (1984). Consistent with that rule, we have frequently declined to address questions beyond what is necessary to resolve a case under AEDPA. See, *e.g., Tyler* v. *Cain*, 533 U. S. 656, 667–668 (2001) (declining to address question where any statement by this Court would be "dictum" in light of AEDPA's statutory constraints on habeas review); cf. *Wiggins* v. *Smith*, 539 U. S. 510, 522 (2003) (noting that *Williams* v. *Taylor*, 529 U. S. 362 (2000), "made no new law" because the "case was before us on habeas review"). No necessity exists to justify the Court's broad announcement today.

The Court concludes that when *Miranda* warnings have been given and understood, "an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Ante*, at 12–13. More broadly still, the Court states that, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Ante*, at 13.

These principles flatly contradict our longstanding views that "a valid waiver will not be presumed . . . simply from the fact that a confession was in fact eventually obtained," *Miranda*, 384 U. S., at 475, and that "[t]he courts must presume that a defendant did not waive his rights," *Butler*, 441 U. S., at 373. Indeed, we have in the past summarily reversed a state-court decision that inverted *Miranda*'s antiwaiver presumption, characterizing

the error as "readily apparent." *Tague*, 444 U. S., at 470–471. At best, the Court today creates an unworkable and conflicting set of presumptions that will undermine *Miranda*'s goal of providing "concrete constitutional guidelines for law enforcement agencies and courts to follow," 384 U. S., at 442. At worst, it overrules *sub silentio* an essential aspect of the protections *Miranda* has long provided for the constitutional guarantee against self-incrimination.

The Court's conclusion that Thompkins' inculpatory statements were sufficient to establish an implied waiver, *ante*, at 14, finds no support in *Butler*. *Butler* itself distinguished between a sufficient "course of conduct" and inculpatory statements, reiterating *Miranda*'s admonition that "'a valid waiver will not be presumed simply from . . . the fact that a confession was in fact eventually obtained.'" *Butler*, *supra*, at 373 (quoting *Miranda*, *supra*, at 475). Michigan suggests Butler's silence "'when advised of his right to the assistance of a lawyer,'" combined with our remand for the state court to apply the implied-waiver standard, shows that silence followed by statements can be a "'course of conduct.'" Brief for Petitioner 26 (quoting *Butler*, *supra*, at 371). But the evidence of implied waiver in *Butler* was worlds apart from the evidence in this case, because Butler unequivocally said "I will talk to you" after having been read *Miranda* warnings. Thompkins, of course, made no such statement.

The Court also relies heavily on *Burbine* in characterizing the scope of the prosecution's burden in proving waiver. Consistent with *Burbine*, the Court observes, the prosecution must prove that waiver was "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation'" and "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Ante*, at 10 (quoting 475 U. S., at 421). I agree with the Court's

statement, so far as it goes. What it omits, however, is that the prosecution also bears an antecedent burden of showing there was, in fact, either an express waiver or a "course of conduct" sufficiently clear to support a finding of implied waiver. Nothing in *Burbine* even hints at removing that obligation. The question in that case, rather, was whether a suspect's multiple express waivers of his rights were invalid because police "misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him." *Id.,* at 420; see also *Colorado* v. *Spring*, 479 U. S. 564, 573 (1987). The Court's analysis in *Burbine* was predicated on the existence of waiver-in-fact.

Today's dilution of the prosecution's burden of proof to the bare fact that a suspect made inculpatory statements after *Miranda* warnings were given and understood takes an unprecedented step away from the "high standards of proof for the waiver of constitutional rights" this Court has long demanded. *Miranda, supra*, at 475; cf. *Brewer* v. *Williams*, 430 U. S. 387, 404 (1977) ("[C]ourts indulge in every reasonable presumption against waiver"); *Zerbst*, 304 U. S., at 464. When waiver is to be inferred during a custodial interrogation, there are sound reasons to require evidence beyond inculpatory statements themselves. *Miranda* and our subsequent cases are premised on the idea that custodial interrogation is inherently coercive. See 384 U. S., at 455 ("Even without employing brutality, the 'third degree' or [other] specific strategems . . . the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals"); *Dickerson* v. *United States*, 530 U. S. 428, 435 (2000). Requiring proof of a course of conduct beyond the inculpatory statements themselves is critical to ensuring that those statements are voluntary admissions and not the dubious product of an overborne will.

Today's decision thus ignores the important interests

*Miranda* safeguards. The underlying constitutional guarantee against self-incrimination reflects "many of our fundamental values and most noble aspirations," our society's "preference for an accusatorial rather than an inquisitorial system of criminal justice"; a "fear that self-incriminating statements will be elicited by inhumane treatment and abuses" and a resulting "distrust of self-deprecatory statements"; and a realization that while the privilege is "sometimes a shelter to the guilty, [it] is often a protection to the innocent." *Withrow* v. *Williams*, 507 U. S. 680, 692 (1993) (internal quotation marks omitted). For these reasons, we have observed, a criminal law system "which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system relying on independent investigation." *Ibid.* (some internal quotation marks omitted). "By bracing against 'the possibility of unreliable statements in every instance of in-custody interrogation,'" *Miranda*'s prophylactic rules serve to "'protect the fairness of the trial itself.'" 507 U. S., at 692 (quoting *Johnson* v. *New Jersey*, 384 U. S. 719, 730 (1966); *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 240 (1973)). Today's decision bodes poorly for the fundamental principles that *Miranda* protects.

## III

Thompkins separately argues that his conduct during the interrogation invoked his right to remain silent, requiring police to terminate questioning. Like the Sixth Circuit, I would not reach this question because Thompkins is in any case entitled to relief as to waiver. But even if Thompkins would not prevail on his invocation claim under AEDPA's deferential standard of review, I cannot agree with the Court's much broader ruling that a suspect must clearly invoke his right to silence by speaking. Taken together with the Court's reformulation of the prosecution's burden of proof as to waiver, today's novel

clear-statement rule for invocation invites police to question a suspect at length—notwithstanding his persistent refusal to answer questions—in the hope of eventually obtaining a single inculpatory response which will suffice to prove waiver of rights. Such a result bears little semblance to the "fully effective" prophylaxis, 384 U. S., at 444, that *Miranda* requires.

## A

Thompkins' claim for relief under AEDPA rests on the clearly established federal law of *Miranda* and *Mosley*. In *Miranda*, the Court concluded that "[i]f [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U. S., at 473–474. In *Mosley*, the Court said that a "critical safeguard" of the right to remain silent is a suspect's "'right to cut off questioning.'" 423 U. S., at 103 (quoting *Miranda*, *supra*, at 474). Thus, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 423 U. S., at 104.[5]

Thompkins contends that in refusing to respond to questions he effectively invoked his right to remain silent,

---

[5] In holding that Mosley's right had been "'scrupulously honored,'" the Court observed that he was properly advised of his rights and indicated his understanding in writing; that police "immediately ceased" interrogation when Mosley stated he did not want to discuss the crime and allowed an "interval of more than two hours" to pass before reapproaching Mosley "at another location about an unrelated [crime]"; and that Mosley was readministered "full and complete *Miranda* warnings at the outset of the second interrogation" and had a "full and fair opportunity to exercise th[o]se options." 423 U. S., at 103–105.

such that police were required to terminate the interrogation prior to his inculpatory statements. In Michigan's view, Thompkins cannot prevail under AEDPA because this Court's precedents have not previously established whether a suspect's ambiguous statements or actions require the police to stop questioning. We have held that a suspect who has "'invoked his right to have counsel present . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless [he] initiates further communication, exchanges, or conversations with the police.'" *Maryland* v. *Shatzer*, 559 U. S. ___, ___ (2010) (slip op., at 5) (quoting *Edwards* v. *Arizona*, 451 U. S. 477, 484–485 (1981)). Notwithstanding *Miranda*'s statement that "there can be no questioning" if a suspect "indicates in any manner . . . that he wishes to consult with an attorney," 384 U. S., at 444–445, the Court in *Davis* v. *United States*, 512 U. S. 452, 461 (1994) established a clear-statement rule for invoking the right to counsel. After a suspect has knowingly and voluntarily waived his *Miranda* rights, *Davis* held, police may continue questioning "until and unless the suspect *clearly* requests an attorney." 512 U. S., at 461 (emphasis added).

Because this Court has never decided whether *Davis*' clear-statement rule applies to an invocation of the right to silence, Michigan contends, there was no clearly established federal law prohibiting the state court from requiring an unambiguous invocation. That the state court's decision was not objectively unreasonable is confirmed, in Michigan's view, by the number of federal Courts of Appeals to have applied *Davis* to invocation of the right to silence. Brief for Petitioner 44.

Under AEDPA's deferential standard of review, it is indeed difficult to conclude that the state court's application of our precedents was objectively unreasonable. Although the duration and consistency of Thompkins' refusal to answer questions throughout the 3-hour inter-

rogation provide substantial evidence in support of his claim, Thompkins did not remain absolutely silent, and this Court has not previously addressed whether a suspect can invoke the right to silence by remaining uncooperative and nearly silent for 2 hours and 45 minutes.

## B

The Court, however, eschews this narrow ground of decision, instead extending *Davis* to hold that police may continue questioning a suspect until he unambiguously invokes his right to remain silent. Because Thompkins neither said "he wanted to remain silent" nor said "he did not want to talk with the police," the Court concludes, he did not clearly invoke his right to silence. *Ante,* at 8–10.[6]

I disagree with this novel application of *Davis*. Neither the rationale nor holding of that case compels today's result. *Davis* involved the right to counsel, not the right to silence. The Court in *Davis* reasoned that extending *Edwards*' "rigid" prophylactic rule to ambiguous requests for a lawyer would transform *Miranda* into a "'wholly irrational obstacl[e] to legitimate police investigative activity'" by "needlessly prevent[ing] the police from questioning a suspect in the absence of counsel even if [he] did not wish to have a lawyer present." *Davis*, *supra*, at 460. But *Miranda* itself "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney." *Mosley*, *supra*, at 104, n. 10; accord, *Edwards*, *supra*, at 485. *Mosley* upheld the admission of statements when police immediately stopped interrogating a suspect who invoked his right to silence, but reapproached him after a 2-hour delay and obtained in-

---

[6] The Court also ignores a second available avenue to avoid reaching the constitutional question. Because the Sixth Circuit declined to decide Thompkins' invocation claim, a remand would permit the lower court to address the question in the first instance. Cf. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

culpatory responses relating to a different crime after administering fresh *Miranda* warnings. The different effects of invoking the rights are consistent with distinct standards for invocation. To the extent *Mosley* contemplates a more flexible form of prophylaxis than *Edwards*—and, in particular, does not categorically bar police from reapproaching a suspect who has invoked his right to remain silent—*Davis'* concern about "'wholly irrational obstacles'" to police investigation applies with less force.

In addition, the suspect's equivocal reference to a lawyer in *Davis* occurred only *after* he had given express oral and written waivers of his rights. *Davis'* holding is explicitly predicated on that fact. See 512 U. S*.,* at 461 ("We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney"). The Court ignores this aspect of *Davis*, as well as the decisions of numerous federal and state courts declining to apply a clear-statement rule when a suspect has not previously given an express waiver of rights.[7]

In my mind, a more appropriate standard for addressing a suspect's ambiguous invocation of the right to remain silent is the constraint *Mosley* places on questioning a suspect who has invoked that right: The suspect's "'right to cut off questioning'" must be "'scrupulously honored.'" See 423 U. S., at 104. Such a standard is necessarily precautionary and fact specific. The rule would acknowl-

---

[7] See, *e.g., United States* v. *Plugh*, 576 F. 3d 135, 143 (CA2 2009) ("*Davis* only provides guidance . . . [when] a defendant makes a claim that he *subsequently* invoked previously waived Fifth Amendment rights"); *United States* v. *Rodriguez*, 518 F. 3d 1072, 1074 (CA9 2008) (*Davis'* "'clear statement'" rule "applies only *after* the police have already obtained an unambiguous and unequivocal waiver of *Miranda* rights"); *State* v. *Tuttle*, 2002 SD 94, ¶14, 650 N. W. 2d 20, 28; *State* v. *Holloway*, 2000 ME 172, ¶12, 760 A. 2d 223, 228; *State* v. *Leyva*, 951 P. 2d 738, 743 (Utah 1997).

edge that some statements or conduct are so equivocal that police may scrupulously honor a suspect's rights without terminating questioning—for instance, if a suspect's actions are reasonably understood to indicate a willingness to listen before deciding whether to respond. But other statements or actions—in particular, when a suspect sits silent throughout prolonged interrogation, long past the point when he could be deciding whether to respond—cannot reasonably be understood other than as an invocation of the right to remain silent. Under such circumstances, "scrupulous" respect for the suspect's rights will require police to terminate questioning under *Mosley*.[8]

To be sure, such a standard does not provide police with a bright-line rule. Cf. *ante*, at 9–10. But, as we have previously recognized, *Mosley* itself does not offer clear guidance to police about when and how interrogation may continue after a suspect invokes his rights. See *Solem* v. *Stumes*, 465 U. S. 638, 648 (1984); see also *Shatzer*, 559 U. S., at \_\_\_ (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 3). Given that police have for nearly 35 years applied *Mosley*'s fact-specific standard in questioning suspects who have invoked their right to remain silent; that our cases did not during that time resolve what statements or actions suffice to invoke that right; and that neither Michigan nor the Solicitor General have provided evidence in this case that the status quo has proved unworkable, I see little reason to believe to-

---

[8] Indeed, this rule appears to reflect widespread contemporary police practice. Thompkins' *amici* collect a range of training materials that instruct police not to engage in prolonged interrogation after a suspect has failed to respond to initial questioning. See NACDL Brief 32–34. One widely used police manual, for example, teaches that a suspect who "indicates," "even by silence itself," his unwillingness to answer questions "has obviously exercised his constitutional privilege against self-incrimination." Inbau 498.

day's clear-statement rule is necessary to ensure effective law enforcement.

*Davis*' clear-statement rule is also a poor fit for the right to silence. Advising a suspect that he has a "right to remain silent" is unlikely to convey that he must speak (and must do so in some particular fashion) to ensure the right will be protected. Cf. *Soffar* v. *Cockrell*, 300 F. 3d 588, 603 (CA5 2002) (en banc) (DeMoss, J., dissenting) ("What in the world must an individual do to exercise his constitutional right to remain silent beyond actually, in fact, remaining silent?"). By contrast, telling a suspect "he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires," *Miranda*, 384 U. S., at 479, implies the need for speech to exercise that right. *Davis*' requirement that a suspect must "clearly reques[t] an attorney" to terminate questioning thus aligns with a suspect's likely understanding of the *Miranda* warnings in a way today's rule does not. The Court suggests Thompkins could have employed the "simple, unambiguous" means of saying "he wanted to remain silent" or "did not want to talk with the police." *Ante*, at 10. But the *Miranda* warnings give no hint that a suspect should use those magic words, and there is little reason to believe police—who have ample incentives to avoid invocation—will provide such guidance.

Conversely, the Court's concern that police will face "difficult decisions about an accused's unclear intent" and suffer the consequences of "'guess[ing] wrong,'" *ante,* at 9–10 (quoting *Davis*, 512 U. S., at 461), is misplaced. If a suspect makes an ambiguous statement or engages in conduct that creates uncertainty about his intent to invoke his right, police can simply ask for clarification. See *id.*, at 467 (Souter, J., concurring in judgment). It is hardly an unreasonable burden for police to ask a suspect, for instance, "Do you want to talk to us?" The majority in *Davis*

itself approved of this approach as protecting suspects' rights while "minimiz[ing] the chance of a confession [later] being suppressed." *Id.,* at 461. Given this straightforward mechanism by which police can "scrupulously hono[r]" a suspect's right to silence, today's clear-statement rule can only be seen as accepting "as tolerable the certainty that some poorly expressed requests [to remain silent] will be disregarded," *id.*, at 471 (opinion of Souter, J.), without any countervailing benefit. Police may well prefer not to seek clarification of an ambiguous statement out of fear that a suspect will invoke his rights. But "our system of justice is not founded on a fear that a suspect will exercise his rights. 'If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.'" *Burbine*, 475 U. S., at 458 (STEVENS, J., dissenting) (quoting *Escobedo* v. *Illinois*, 378 U. S. 478, 490 (1964)).

The Court asserts in passing that treating ambiguous statements or acts as an invocation of the right to silence will only "'marginally'" serve *Miranda*'s goals. *Ante*, at 10. Experience suggests the contrary. In the 16 years since *Davis* was decided, ample evidence has accrued that criminal suspects often use equivocal or colloquial language in attempting to invoke their right to silence. A number of lower courts that have (erroneously, in my view) imposed a clear-statement requirement for invocation of the right to silence have rejected as ambiguous an array of statements whose meaning might otherwise be thought plain.[9] At a minimum, these decisions suggest

---

[9] See *United States* v. *Sherrod*, 445 F. 3d 980, 982 (CA7 2006) (suspect's statement "'I'm not going to talk about nothin''" was ambiguous, "as much a taunt—even a provocation—as it [was] an invocation of the right to remain silent"); *Burket* v. *Angelone*, 208 F. 3d 172, 200 (CA4 2000) (upholding on AEDPA review a state court's conclusion that "'I just don't think that I should say anything'" was not a clear request to

that differentiating "clear" from "ambiguous" statements is often a subjective inquiry. Even if some of the cited decisions are themselves in tension with *Davis*' admonition that a suspect need not "'speak with the discrimination of an Oxford don'" to invoke his rights, 512 U. S., at 459 (quoting *id.*, at 476 (opinion of Souter, J.)), they demonstrate that today's decision will significantly burden the exercise of the right to silence. Notably, when a suspect "understands his (expressed) wishes to have been ignored . . . in contravention of the 'rights' just read to him by his interrogator, he may well see further objection as futile and confession (true or not) as the only way to end his interrogation." *Id.,* at 472–473.

For these reasons, I believe a precautionary require-

_____

remain silent); *State* v. *Jackson*, 107 Ohio St. 3d 300, 310, 2006–Ohio–1, ¶¶96–98, 839 N. E. 2d 362, 373 (finding ambiguous "'I don't even like talking about it man . . . I told you . . . what happened, man . . . I mean, I don't even want to, you know what I'm saying, discuss no more about it, man'"); *State* v. *Speed*, 265 Kan. 26, 37–38, 961 P. 2d 13, 24 (1998) (finding ambiguous "'[a]nd since we're not getting anywhere I just ask you guys to go ahead and get this over with and go ahead and lock me up and let me go and deal with Sedgwick County, I'm ready to go to Sedgwick County, let's go'"); *State* v. *Markwardt*, 2007 WI App 242, ¶1, 306 Wis. 2d 420, 424, 742 N. W. 2d 546, 548 ("'Then put me in jail. Just get me out of here. I don't want to sit here anymore, alright? I've been through enough today'" ambiguous because it could be construed as part of "'thrust-and-parry'" between suspect and interrogator); *State* v. *Deen*, 42,403, pp. 2–4 (La. App. 4/27/07), 953 So. 2d 1057, 1058–1060 ("'Okay, if you're implying that I've done it, I wish to not say any more. I'd like to be done with this. Cause that's just ridiculous. I wish I'd . . . don't wish to answer any more questions'" ambiguous because conditioned on officer's implication that suspect committed specific assault). Courts have also construed statements as expressing a desire to remain silent only about a particular subject. See, *e.g., People* v. *Silva*, 45 Cal. 3d 604, 629–630, 754 P. 2d 1070, 1083–1084 (1988) ("'I really don't want to talk about that'" only conveyed unwillingness to discuss certain subjects). See generally Strauss, The Sounds of Silence: Reconsidering the Invocation of the Right to Remain Silent under *Miranda*, 17 Wm. & Mary Bill Rights J. 773, 788–802 (2009) (surveying cases).

ment that police "scrupulously hono[r]" a suspect's right to cut off questioning is a more faithful application of our precedents than the Court's awkward and needless extension of *Davis*.

\*   \*   \*

Today's decision turns *Miranda* upside down. Criminal suspects must now unambiguously invoke their right to remain silent—which, counterintuitively, requires them to speak. At the same time, suspects will be legally presumed to have waived their rights even if they have given no clear expression of their intent to do so. Those results, in my view, find no basis in *Miranda* or our subsequent cases and are inconsistent with the fair-trial principles on which those precedents are grounded. Today's broad new rules are all the more unfortunate because they are unnecessary to the disposition of the case before us. I respectfully dissent.