Filed 3/26/13  P. v. Warren CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DESHANE EARL WARREN,<br><br>        Defendant and Appellant. | A134632<br><br>(Contra Costa County<br>Super. Ct. No. 081106-7) |

Following a jury trial and imposition of sentence, Deshane Earl Warren appeals from his conviction of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1] and personally using a firearm in the commission of this offense (§ 12022.5, subd. (a)). Appellant's appointed counsel raises no issues, and requests an independent review of the record under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*).  Based on our review of the record and appellant's contentions, we conclude that there are no arguable issues.

## BACKGROUND

The information filed by the Contra Costa District Attorney charged appellant and codefendant Chad Walker with first degree murder (§ 187) and intentionally discharging a firearm in the commission of this offense (§ 12022.53, subds. (b)-(d)).

Richmond Police Officer Joanna Grivetti testified that she received a dispatch regarding a shooting that occurred at 34th Street and Nevin Avenue in Richmond,

---

[1] Further code section references are to the Penal Code unless otherwise indicated.

1

California. Grivetti stated that the scene was "chaotic"; distressed family members yelled frantically, and others crowded the area to observe what occurred. Amid the commotion, Grivetti found the victim Davonte Wesley lying on the road. Wesley was gravely injured and unresponsive.

According to Grivetti, paramedics that aided Wesley discovered a gun in the pocket of his pants. Grivetti further stated that she collected 14 shell casings at the scene.

Ikechi Ogan, a forensic pathologist, testified that Wesley suffered six grazing gunshot wounds and six gunshot wounds that punctured his body. Ogan indicated that Wesley died seconds after suffering these injuries.

Richmond Police Officer Thomas Hauschild testified that on the day of the incident, he was on the lookout for a vehicle implicated in the shooting. Based on a dispatch regarding where the vehicle was last seen, he headed to an area where he thought the vehicle would most likely be found. When he got to that area, he spotted the vehicle that matched the description. Hauschild stopped the car and arrested the driver, codefendant Walker, and the passenger, appellant. Hauschild then searched the car, and discovered appellant's shirt in the back seat and a gun under the front passenger seat.

The prosecution introduced expert witnesses who testified regarding the gun and shirt Hauschild discovered. Terrence Wong, a firearms examiner for the Federal Bureau of Investigation, indicated that the gun Hauschild discovered was not the gun used in the shooting. Margaret Kaleuati, an expert in gunshot residue identification, found gunshot residue on appellant's shirt that Hauschild found. Kaleuati further testified that an examination of appellant and Walker's gunshot residue kits revealed both had gunshot residue on their hands at the time of their arrest.

### Witnesses at the Scene

Ashley Wicks testified that she was Wesley's girlfriend, and that she was present at the scene when Wesley was shot. Wicks recalled the event as follows: On the day of the incident, she drove her car to Wesley's cousin's house, located near 34th Street in Richmond, with Wesley and Wicks's friend, Kela Spears. After Wicks parked her car on

2

the corner of 34th Street and Nevin Avenue, Wesley left the car. Wicks remained in the car.

While in her car, Wicks heard Wesley greet and engage in a friendly conversation with someone outside. She heard Wesley telling the person outside that he was going to " 'lock him in.' " According to Wicks, this meant that Wesley was going to save that person's phone number in Wesley's phone. Wesley reached back into Wicks's car to retrieve his phone from Spears, who was borrowing his phone. Wicks then heard a gunshot, the first of more than 10 shots that were fired.

Spears testified that she was borrowing Wesley's phone when they were together in Wicks's car. According to Spears, when Wesley reached back into Wicks's car and asked Spears for his phone back, she heard gun shots.

David Busby testified that on the day of the incident, from the garage of his home on 35th Street in Richmond, he saw a black car park in front of his car. Ten to 15 minutes later, Busby heard gunshots. Busby then saw a man running up 35th Street who mumbled " 'oh shit,' " as he passed by; the man got into the black car. Busby stated that he called 911 to report the black car's license plate, and identified appellant as the man running up 35th Street during a police interview.

### Appellant's Testimony

Appellant testified that on the day of the incident, codefendant Walker picked appellant up in a black car. They then drove to 34th Street and Nevin Avenue in Richmond to purchase marijuana from an individual who lived in that area. After Walker parked on 35th Street, appellant left the car alone, armed with Walker's gun. While walking down 35th Street to purchase the marijuana, appellant saw Wesley.

Appellant was displeased to see Wesley because Wesley fired a gun at Walker not long before. He also knew Wesley as a gang member who had killed people in the past. Therefore, appellant tried to avoid Wesley, but could not because Wesley called appellant's name. A conversation between the two ensued.

Wesley asked if appellant was with Walker, and appellant answered that he was not. Wesley then reached into a car parked nearby and stated, "give it to me." Appellant

3

thought that Wesley might have been reaching for a weapon, so he observed him closely. Appellant saw Wesley reach for what appeared to be a gun, at which point appellant panicked and started shooting. Appellant then ran back to 35th Street to the car he came in, and told Walker what happened.

After Walker heard what occurred, Walker told appellant to take appellant's shirt off and give Walker the gun. They drove to South 35th Street, where Walker got out of the car with the gun and returned without it. They then drove to appellant's father's house, and were stopped by police along the way.

### *Walker's Testimony*

Walker testified that on the day of the incident, he picked up appellant and headed to 34th Street in Richmond to purchase marijuana. Walker dropped appellant off at 35th Street and parked nearby.

While waiting for appellant in the car, Walker heard gunshots. Soon after, appellant returned to the car and told Walker what happened. Walker then told appellant to give Walker the gun. Walker took the gun to his cousin's house and placed the gun under a mattress.

Walker further testified that Wesley fired a gun at him in the past, but denied any longstanding problems with Wesley. However, Walker stated that he entered Wesley's contact information in Walker's phone as "Dead Man Walking" after Wesley fired a gun at him.

### *Riando Gaines's Testimony*

Riando Gaines testified that he was housed in the same jail cell as Walker. While in their cell, Walker recounted the incident to Gaines. Walker stated that on the day of the incident, he was driving with appellant on Nevin Avenue, when he saw Wesley standing near a parked car. Walker told Gaines that he did not like Wesley because Wesley had robbed Walker in the past and had fired a gun at him two weeks after that robbery. Walker mentioned that Wesley's name in Walker's cell phone was listed as "Dead Man Walking."

4

According to Gaines, Walker stated that he feared a possible shootout if Wesley saw him, so Walker asked appellant, who had no longstanding problems with Wesley, to shoot Wesley. Walker claimed that he gave the gun used in the shooting to his girlfriend, and instructed her to keep it at her mother's house. Walker further stated that he used code words during a call he made in jail regarding the location of the gun used in the shooting.

In response to Gaines's testimony, Walker testified that he never told Gaines that he asked appellant to kill Wesley, and claimed that Wesley never robbed him.

### *Other Prosecutorial Evidence*

Over appellant's objection, the prosecution introduced the following evidence: a letter discovered in Walker's jail cell allegedly instructing people to testify falsely on his behalf; Walker's statement urging people to contact witnesses to cover up his complicity in the shooting; Walker's recorded phone conversation, in which Walker allegedly discusses the whereabouts of the gun used in the shooting; and statements appellant made during a police interrogation.

Based on the foregoing testimony, the jury convicted appellant of the lesser included charge of voluntary manslaughter (§ 192, subd. (a)), and found sufficient support that appellant personally used a firearm pursuant to section 12022.5, subdivision (a). The jury acquitted Walker of all charges. Appellant was sentenced to 16 years in prison, six years for the voluntary manslaughter and a consecutive, aggravated term of 10 years for the firearm enhancement.

Appellant filed a timely notice of appeal.

### DISCUSSION

In accordance with *Wende* and *Anders*, appellant's counsel elected to file a supplemental brief, raising the following three points for our consideration: (1) whether the court violated the confrontation clause of the Sixth Amendment or hearsay rules when it permitted introduction of Walker's incriminating statements implicating appellant; (2)

5

whether the court violated appellant's *Miranda*[2] and Fifth Amendment rights when it admitted statements appellant made to police; and (3) whether the court properly denied appellant's *Wheeler/Batson* motions made in response to the prosecution's preemptory challenges to exclude African-American jurors. We have reviewed the entire record and considered the matters suggested by appellant's counsel, and find no arguable issues.

## I. *Appellant's Sixth Amendment and Hearsay Contentions*

Relying on *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), appellant sought to sever his trial in response to the prosecution's intention to introduce Walker's admissions to Riando Gaines, Walker's phone calls in jail, an incriminating letter seized from Walker's jail cell, and Walker's statement urging people to contact one of the witnesses. Because Walker could not be cross-examined, appellant asserted that the admission of these statements implicating appellant in the charged offense violated his Sixth Amendment right to confrontation according to *Bruton* and *Aranda*. Alternatively, appellant moved to exclude Walker's statements on hearsay grounds.

On appellant's claim of severance, " '*Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of the defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' "[3] (*People v. Homick* (2012) 55 Cal.4th 816, 874, citing *People v. Jennings* (2010) 50 Cal.4th 616, 652.) In such cases, *Bruton* and *Aranda* necessitate severance, or exclusion of statements implicating a defendant. (See *Homick*, at p. 874.) However, because the confrontation clause does not apply to nontestimonial evidence, *Bruton* and *Aranda*, likewise, do not apply to nontestimonial evidence. (See *People v.*

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

[3] To the extent *Aranda* " 'require[d] the exclusion or relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)).' " (*Homick*, *supra*, 55 Cal.4th at p. 874, fn. 34, quoting *People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

*Cage* (2007) 40 Cal.4th 965, 984 ["the confrontation clause is concerned solely with hearsay statements that are testimonial"]; see also *People v. Arceo* (2011) 195 Cal.App.4th 556, 572 ["the confrontation clause has no application to out-of-court nontestimonial statements]."]  Testimonial statements are "statements made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Cage*, at p. 984, fn. 14.)  Because the record demonstrates that Walker's out-of-court statements were not for the purpose of use in a criminal trial, his statements are nontestimonial.  As a result, *Bruton* and *Aranda* do not require severance because they do not apply to Walker's statements.

Regarding appellant's alternative hearsay ground, under the hearsay exception for declaration against interest:  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement . . . subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)  "[U]navailable as a witness" includes the circumstance that a declarant is exempted or precluded from testifying on the ground of privilege.  (Evid. Code, § 240.)  In addition, a statement made against one's interest must be trustworthy.  (*People v. Duarte* (2000) 24 Cal.4th 603, 611.)  To determine whether a statement is sufficiently trustworthy, the court " ' "may take into account . . . the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." ' " (*Id.* at p. 614, quoting *People v. Cudjo* (1993) 6 Cal.4th 585, 607.)

The record demonstrates that Walker's statements fall within the declaration against interest exception.  First, Walker was an unavailable witness as defined in section 1230 because his assertion of his Fifth Amendment right of silence precluded him from testifying.  Second, statements that Walker made to Gaines were against his penal interest because they subjected Walker to criminal liability for his part in the shooting.  While we recognize Gaines's history of criminality and the presumed benefits he might have received for testifying, his friendship with Walker and other corroborating evidence are

7

sufficient indicia of trustworthiness. Similarly, Walker's phone calls in jail regarding the gun's whereabouts, his incriminating letter instructing a person to testify falsely to avoid blame, and his statements urging people to contact one of the witnesses all constitute statements made against his interest. That these statements were confided to people that Walker trusted is sufficient proof of trustworthiness.

## II. *Appellant's Attempt to Exclude His Statements to Police*

Appellant also moved to exclude statements he made to police during a custodial interrogation on Fifth Amendment grounds. First, appellant claimed that he never waived his right to remain silent before the interrogation, and that he invoked that right during the interrogation when he asked the interrogating detective to send him back to his jail cell. He asserted that subsequent questioning constituted violation of his *Miranda* right to remain silent. In addition, appellant claimed that his statements were otherwise involuntary, rendering them inadmissible as a violation of his Fifth Amendment rights.

The *Miranda* right to remain silent can be waived explicitly or implicitly. (See *Berghuis v. Thompkins* (2010) 130 S.Ct. 2250, 2261.) For implied waivers, if a suspect is read his *Miranda* rights and he understands them, the suspect's subsequent uncoerced statements constitute an implied waiver of his right to remain silent. (*Berghuis*, at p. 2262 [suspect implicitly waived his right to remain silent when he began answering questions after remaining silent for nearly three hours].)

The record demonstrates that appellant implicitly waived his *Miranda* right to remain silent. Before the interrogation, the detective who conducted the interrogation advised appellant of his *Miranda* rights. The detective then asked if appellant understood his rights, and appellant stated that he did. Immediately after being advised of his rights, appellant initiated a discussion with the detective by asking him a question, and appellant proceeded to freely answer all the questions that followed. In doing so, appellant implicitly waived his right to remain silent.

Appellant also claims that he invoked his *Miranda* right to remain silent during the interrogation. However, a mid-interrogation invocation to remain silent must be clear and unambiguous. (*People v. Williams* (2010) 49 Cal.4th 405, 434.) " 'A defendant has

not invoked his or her right to silence when the defendant's statements were merely expressions of passion frustration or animosity toward the officers . . . .' " (*Id.* at p. 433.) Here, the record demonstrates that appellant's request to return to his cell during the interrogation was an expression of his frustration with the detective's refusal to accept appellant's denials of his involvement in the shooting, rather than an unambiguous invocation of his right to remain silent.

Appellant further asserts that his statements were otherwise involuntary, rendering them inadmissible as a violation of his Fifth Amendment rights. A statement is involuntary if it is not the product of " ' "a rational intellect and free will." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 404, citing *Mincey v. Arizona* (1978) 437 U.S. 385, 398.) The test is whether the appellant's " 'will was overborne at the time he confessed.' " (*Maury*, at p. 404, citing *Mincey*, at p. 398.) In view of the foregoing facts surrounding the interrogation, we conclude that appellant's statements were not involuntary.

### III.    *Appellant's Batson/Wheeler Motions*

In response to the prosecution's use of peremptory challenges to exclude five African-American jurors, appellant made *Wheeler*/*Batson* motions in each case. (*Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.) In each case, the prosecution offered race neutral explanations in exercising his preemptory challenges.[4]

We must review the court's findings concerning sufficiency of reasons proffered for exercising peremptory challenges " ' " ' 'with great restraint.' " ' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613, quoting *People v. Burgener* (2003) 29 Cal.4th 833, 864.) " 'So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Lenix*, at p. 614, quoting *Burgener*, at p. 864.) The prosecution offered race

---

[4] The court denied appellant's *Batson*/*Wheeler* motion made in response to the prosecution's first challenge to exclude an African-American because appellant failed to establish a prima facie case. The prosecution still elected to offer race neutral reasons for excluding that juror.

neutral reasons for exercising preemptory challenges to exclude African-American jurors, and the court considered these explanations before denying appellant's *Wheeler/Batson* motions. The record shows that the court made a sincere and reasoned effort to evaluate the prosecution's race neutral reasons.

## DISPOSITION

Our independent review of the record reveals no arguable issues that require further briefing. The judgment is affirmed.

_____
Lambden, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.