Filed 12/8/15  P. v. Kurre CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASMINE LEVANNA KURRE,<br><br>Defendant and Appellant. | C074709<br><br>(Super. Ct. No. 11F02665)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion of this court filed November 30, 2015, in the above entitled case is modified as follows:

On page 3 of the first full paragraph, fifteenth line down, the sentence that starts with "Defendant was very surprised and responded . . . ." delete "Defendant" and insert "The victim" in its place.

1

This modification does not change the judgment.

BY THE COURT:

_____
Raye, P. J.


_____
Robie, J.


_____
Renner, J.

Filed 11/30/15  P. v. Kurre CA3 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074709 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F02665) |
| v. | |
| JASMINE LEVANNA KURRE, | |
| Defendant and Appellant. | |

Defendant Jasmine Levanna Kurre lured the victim, Branden Rose, out of his apartment to be severely beaten by at least two men, after Rose, defendant, and one other man had a sexual encounter two days prior to the beating when defendant's boyfriend was out of town.  During the beating, the attackers took Rose's cell phone and $10 to $15.  The People alleged defendant was an aider and abettor.  The jury found defendant guilty of assault with force likely to produce great bodily injury and battery with serious bodily injury, but it found her not guilty of robbery and making a false police report.

1

On appeal, defendant raises the following three contentions: (1) the court erred in allowing the People to use her prearrest silence as evidence of her guilt; (2) the People presented insufficient evidence of the crimes because simply being present at the crime scene and failing to stop the crimes did not make her an aider and abettor; and (3) the court erred in requiring her to pay restitution for the stolen cell phone and money because she was acquitted of robbery.

We affirm because: (1) the instances when defendant refused to identify who she was with during the beating were not invocations of her right to remain silent; (2) defendant was much more than simply present at the crime scene -- she had a motive for the beating, knew what her cohorts were doing, and helped them commit the crimes; and (3) defendant's actions were a substantial factor in causing the loss of Rose's phone and money, and her relationship to Rose's loss was not simply by way of the robbery.

FACTUAL AND PROCEDURAL BACKGROUND

On February 15, 2011, defendant, her friend Tatyona Voznyuk, Rose, and his friend Pavel Chernykh were hanging out at Rose's apartment in Citrus Heights.

Later that evening while they were all drinking at a bar, defendant mentioned she had a boyfriend who was out of town. After staying at the bar a while longer, the four returned to Rose's apartment. At the apartment, the four drank more alcohol, and defendant had sex with Chernykh and Rose, at one point simultaneously. According to Rose, all the sex he engaged in or saw that night was consensual. With defendant's consent, Chernykh taped portions of the sexual encounters on his cell phone.

A little after 7:00 the next morning, defendant and Voznyuk left Rose's apartment. Before leaving, defendant asked Chernykh for his cell phone number. Then, Rose and Chernykh walked defendant and Voznyuk to their car, and Rose gave the two women hugs.

Thereafter, defendant began texting Chernykh "regular texts" to get to know him. In one of those texts, defendant mentioned that she left her identification and her hair

2

extension at Rose's apartment. Chernykh texted Rose about them, and Rose said he had found defendant's identification.

On February 17, 2011, defendant texted Rose that she wanted to pick up her identification, and defendant told her to text or call him when she arrived at his apartment complex. Around 6:00 p.m., defendant called Rose, told him she was downstairs at his apartment complex, and told him to come downstairs with her license because she was in a hurry. It was dark, and Rose walked downstairs. Once downstairs, Rose saw defendant standing underneath the parking structure with her arms crossed. He said, "hi," but she stood there straight faced, seeming nervous. A man came from behind Rose and bear hugged him. Rose thought it was his roommate playing a trick on him, so he smiled. Rose looked at defendant, who was staring to the right. Rose was then attacked by another man coming from the direction where defendant had been staring, who hit Rose on his jawbone. Rose fell to the ground, and then the two men starting kicking and punching Rose all over his body, including his head, ear, neck, and back. There was another man who was calling orders to the two men beating Rose. Defendant said nothing. In the middle of the beating, one of the attackers said, "You want to rape my girl?" Defendant was very surprised and responded, "I would never rape your girl." The beating continued for a total of five to seven minutes. The beating ended when Rose yelled, "you would do this to a military personnel?" The caller then told the attackers to "[g]o into [Rose's] pockets." The attackers took Rose's cell phone and $10 to $15, and then all of the perpetrators took off.

Rose was stranded because he could not call for help, and he was in need of help because he had been severely beaten. Eventually he made it back to his apartment, and with his roommate's help, he called 911. Citrus Heights Police Officer Chad Morris and his partner came to Rose's apartment. Officer Morris said that the trauma to Rose's face was among the worst he had ever seen as the result of a fight.

3

A little while later, Officer Morris knocked at defendant's door for close to an hour without receiving an answer, although the lights and television were on and a fire was burning in the fireplace. Officer Morris left his business card with a handwritten note for defendant, which read, "Call me so we can work this out. Otherwise, I will be issuing a warrant for your arrest." The business card was from the Citrus Heights Police Department. Officer Morris never heard from defendant.

The next morning, February 18, 2011, defendant went to the Sacramento City Police Department and reported she had been raped on February 16 in Citrus Heights. Sacramento police called Citrus Heights Police Officer Fernando Ruotolo, told him that, and also told him that defendant was a suspect in an assault and robbery. Sacramento police asked Officer Ruotolo to investigate the rape.

Officer Ruotolo met defendant at the Sacramento City Police Department to interview her about the rape. The Sacramento Police Department offered its interview room, but Ruotolo declined because he was told he would not be able to leave the interview room. With defendant's permission, he drove her (in the front seat of the patrol car) to the Citrus Heights Police Station, because it did not have that restriction. At the interview, "it was like pulling teeth" to get defendant to talk about the rape allegation. Officer Ruotolo then asked defendant how she got her driver's license back. She said, "I went over there and got it." Officer Ruotolo responded, "I'm sorry, What's that?" Defendant responded, "I wanna go. I wanna go to the hospital. My stomach hurts really bad . . . ." Defendant then talked about the rape. Thereafter, Officer Ruotolo returned to the topic of retrieving her driver's license. He asked, "When you went to get the driver's license, um, and luckily you were thinking ahead of time, um, for your safety, uh, who all went with you?" Defendant responded, "I don't want to really talk about that." She asked to go to the hospital because her stomach hurt. Officer Ruotolo asked whether Voznyuk went with her to pick up her license. Defendant responded "no," because Voznyuk got called into work. Defendant then talked more about the rape. Ruotolo

4

responded, "there's some information that you're withholding," and then asked her again who went with her to retrieve her driver's license. Defendant responded, "I'm scared. And like you told me that I could leave at any time." Officer Ruotolo said she could leave, and the interview ended. Thereafter, Officer Ronald Pfleger arrested her in the hallway, noting that while she was free to leave on the rape investigation, he was here to talk with her about "something else."

One of the police officers examined defendant's cell phone. On February 16, 2011, the day before Rose was attacked, defendant texted Andrew Turner that she had been raped. Turner responded by text with the following messages: "I have friends with scary amounts of power. I can change the[ir] li[f]e for the worse if you ask me to," and "I don't have to have him killed, but I can make it impossible for him to get much done for the rest of his life." Defendant responded, "I hate him so much Andrew."

## DISCUSSION

## I

### *The Court Did Not Err In Allowing The People To Use Defendant's Refusal To Answer Certain Questions During The Police Interview As Evidence Of Her Guilt*

Defendant contends she "expressly invoked her Fifth Amendment rights" to remain silent when she was asked during a police interview who was with her during the beating (i.e., when she went to retrieve her identification), and therefore, the trial court erred in allowing the People to use her prearrest silence as substantive evidence of her guilt. We disagree, because the three instances when defendant refused to identify who she was with during the beating were not invocations of her right to remain silent.

The interview to which defendant is referring occurred the morning after the beating at the Citrus Heights Police Station with Officer Ruotolo. The People, in closing argument, used defendant's refusal to answer Officer Ruotolo's questions about who she was with when she went to retrieve her identification as an inference of her guilt on the

charged crimes.  Specifically, the People argued that the "only reasonable interpretation" "as to why she won't tell him who was with her when she went to get her ID" was "that she brought the attackers to beat up and rob [the victim]."

"[T]he Fifth Amendment privilege against self-incrimination does not categorically bar the prosecution from relying on a defendant's pretrial silence. . . .  The prosecution may . . . use a defendant's prearrest silence in response to an officer's question as substantive evidence of guilt, provided the defendant has not expressly invoked the privilege." (*People v. Tom* (2014) 59 Cal.4th 1210, 1223.)  "[A] suspect's invocation of the right to silence" requires "an unambiguous and unequivocal assertion." (*People v. Nelson* (2012) 53 Cal.4th 367, 377.)  "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' " (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 382 [176 L.Ed.2d 1098, 1111].)  "In such circumstances, suppression of a voluntary confession 'would place a significant burden on society's interest in prosecuting criminal activity.' "  (*Nelson*, p. 378, quoting *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 382 [176 L.Ed.2d at p. 1111].)

Here, the three instances when defendant refused to identify who she was with during the beating were not invocations of her right to remain silent.  The first time, when Officer Ruotolo asked defendant, "What's that" to clarify defendant's response that, "I went over there and got it,"  defendant's response was only, "I wanna go.  I wanna go to the hospital.  My stomach hurts really bad . . . ."  Defendant was saying only that she wanted to go because her stomach hurt.  The second time, when Officer Ruotolo asked, "When you went to get the driver's license, um, and luckily you were thinking ahead of time, um, for your safety, uh, who all went with you," defendant responded, "I don't want to really talk about that."  Our Supreme Court has specifically ruled that this response is not an invocation of a defendant's right to remain silent. (*People v. Musselwhite* (1998)

6

17 Cal.4th 1216, 1240 [defendant's statement, ' "I really don't want to talk about that," ' did not amount to an invocation of his right to remain silent].) Indeed, as evidenced by the next statement defendant made about who she was *not* with when she went to retrieve her license (i.e., Voznyuk, because she was called into work), a defendant may indicate a willingness to talk about certain subjects and then "an unwillingness to discuss certain [other] subjects without manifesting a desire to terminate 'an interrogation already in progress.' " (*People v. Silva* (1988) 45 Cal.3d 604, 629-630.) Finally, the third time, when Officer Ruotolo said "there's some information that you're withholding," and then asked her again who went with her to retrieve her driver's license, defendant responded, "I'm scared," there was no invocation of her right to remain silent, equivocal or not. As such, the People did not violate defendant's Fifth Amendment privilege against self-incrimination in using her responses against her.

## II

### *There Was Sufficient Evidence Defendant Aided And Abetted The Crimes*

Defendant contends the People presented insufficient evidence of the crimes because her mere presence at the crime scene and failure to stop the crimes did not make her an aider and abettor. As we explain, the problem with defendant's argument is that defendant was much more than simply present at the crime scene -- she had a motive for the beatings, knew what her cohorts were doing, and helped them commit the offenses. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 ["[a]n aider and abettor . . . must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense' "].)

The day before Rose was attacked, defendant texted Andrew Turner that she had been raped. Turner responded that, "I have friends with scary amounts of power. I can change the[ir] li[f]e for the worse if you ask me to," and "I don't have to have him killed, but I can make it impossible for him to get much done for the rest of his life." Defendant

7

responded by stating, "I hate him so much Andrew." From this, the jury could infer that defendant had a motive for the beating of Rose. The next day, defendant lured Rose out of his apartment so that her cohorts could beat him. Specifically, defendant called Rose, told him she was downstairs at his apartment complex and told him to come downstairs with her license because she was in a hurry. From this, the jury could reasonably infer that defendant lured Rose to a vulnerable location by bringing him downstairs in the dark away from his roommate to a place where he would be attacked without anybody to come to his aid. Once Rose was downstairs, Rose was attacked by two or three men. Right before the attack, defendant said nothing to Rose, seemed nervous, and stared to the right, which was the direction from where the first blow came. From this, the jury could reasonably infer that defendant knew where the perpetrators were, and all of them were acting as part of a premeditated plan. During the attack, one of the men said, "You want to rape my girl?" From this mention about rape, the jury could infer that the men were acting at defendant's request in retaliation for Rose allegedly raping defendant.

This evidence was sufficient for the jury to conclude that defendant was not a mere bystander, but rather, somebody who acted with knowledge of the crimes and an intent to facilitate them.

III

*The Court Acted Within Its Discretion In Awarding*

*Restitution For Rose's Cell Phone And Cash*

Defendant contends the court erred in ordering her to pay $215 in restitution for the stolen cell phone and money because she was acquitted of the robbery. We disagree, because defendant's actions were a substantial factor in causing the loss of Rose's phone and money, and defendant's relationship to Rose's loss was not simply by way of the robbery.

The statute governing victim restitution provides in pertinent part as follows: "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim . . . in an amount established by court order, based on the amount of loss claimed by the victim . . . ." (Pen. Code, § 1202.4, subd. (f).) Our court has applied the principle of proximate cause in determining victim restitution (*People v. Jones* (2010) 187 Cal.App.4th 418, 425), and that principle turns on whether the actions of the defendant were "a substantial factor in causing the victims' damages" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1322). "[A] restitution order is not authorized where the defendant's *only relationship* to the victim's loss is by way of a crime of which the defendant was acquitted." (*People v. Percelle* (2005) 126 Cal.App.4th 164, 180, italics added.) Application of these principles leads to the conclusion that the court was within its discretion to award the restitution. (*People v. Giordano* (2007) 42 Cal.4th 644, 663 [standard of review for restitution order].)

Although defendant was acquitted of the robbery, she was instrumental in setting up the beating. She provided the motive and lured Rose out of his apartment to be beaten up by two or three men who were waiting for him. The taking of Rose's cell phone and cash by defendant's cohorts made it more difficult for Rose to call for help or report the beating and could also be seen as an effort to deprive police of evidence of the fact that she called Rose so she could come to his apartment complex to retrieve her identification.

Thus, defendant's participation in the assault and battery were part and parcel of the actions that led her cohorts to take Rose's phone and cash, which occurred just as the beating was coming to an end. As such, the court could reasonably conclude that the phone and money were taken to make it easier for defendant and her cohorts to get away with the assault and battery, and there was no error in awarding restitution for those items.

## DISPOSITION

The judgment is affirmed.

/s/

Robie, J.

We concur:

/s/

Raye, P. J.

/s/

Renner, J.

10