IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84939-5-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JONNATHAN RAY HOSKINS, | |
| Appellant. | |

CHUNG, J. — Hoskins was convicted of murder in the first degree pursuant to RCW 9A.32.030(1)(c) (felony murder), predicated on burglary in the first degree. The charges were based on the shooting of Kam Tam and the burglary of a shed in her backyard, which contained a "marijuana grow operation." On appeal, Hoskins challenges the trial court's refusal to give an instruction regarding the lesser included offenses of burglary in the second degree and criminal trespass. Hoskins also assigns error to the court's response to a question from the jury, claiming it was an improper comment on the evidence. Further, he challenges the trial court's admission of his statements to police, claiming he had invoked his right to remain silent. Finally, he challenges the trial court's consideration of his juvenile adjudications in calculating his offender score and the imposition of the victim penalty assessment (VPA) in his judgment and sentence. We conclude there was no error and affirm Hoskins's conviction but remand to the trial court to strike the VPA from his sentence.

FACTS

On November 22, 2018, Yiu Lau arrived home around 11:00 p.m. and noticed that the gate to the backyard was open. He found his wife, Kam Tam, lying at their front door. Believing that Tam had passed out, Lau shouted for his son to help get her inside and to call 911. Paramedics responded to the scene and administered CPR on Tam. They discovered a puncture wound on her abdomen before declaring her deceased. An autopsy revealed that Tam was killed by a gunshot wound to the abdomen.

Seattle Police Department (SPD) also responded to the scene and found a "marijuana grow operation" in a shed located in the backyard of Tam's house. SPD also discovered safety bars pried off the house's back window, a crow bar, broken cannabis debris in the shed, a cannabis plant in the yard next door, and latex gloves.[1] Upon testing, DNA found in the gloves was linked to Hoskins.

SPD obtained video footage from the night of the shooting that showed persons walking toward the backyard of Tam's home and a car drive past her house several times. This footage also showed Tam arriving home and walking toward the side of the house near the backyard, followed by the sound of a gunshot.

---

[1] As the Washington Supreme Court has noted, the use of the term "marijuana" is rooted in racism, and for this reason, the Washington legislature has enacted a law to replace the term in statutes with the term "cannabis." State v. Fraser, 199 Wn.2d 465, 469 n.1, 509 P.3d 282 (2022) ("The transition from using the scientific 'cannabis' to 'marijuana' or 'marihuana' in the early 20th century stems from anti-Mexican, and other racist and anti-immigrant, sentiments and efforts to demonize cannabis."). Thus, we use the term "cannabis" in this opinion, unless quoting another source.

At trial, Hoskins testified that he learned that Tam's house contained a cannabis grow operation and that he went to the address alone to check if anyone was home. Hoskins explained that he walked by the front of Tam's house and noticed a lock on the fence, so he proceeded to the back of the house and hopped over the fence. He explained that he discovered the grow operation in a shed in the backyard and contacted his friend Stanley Lee to inform him that no one was home. Lee subsequently arrived at Tam's home with Brandon Cerna. Hoskins testified that he initially entered the shed by himself while Lee and Cerna attempted to pry the bars from the window of Tam's house, but that he redirected them to the cannabis plants. The three men then entered the shed and began to take the plants. Hoskins testified at trial that at that time, he did not have any knives or firearms and that he did not see Lee or Cerna with any weapons. However, he had told the police previously that he saw Lee with a gun that night.

Hoskins testified that he collected the cannabis plants in bags and began to leave, but "as I'm leaving, I see the light come on, the motion light . . .  [and] I hear like a – a voice of some sort." Then, as Hoskins was on his way to his car, he heard a "pow" and proceeded to go home. The following day Lee called Hoskins and asked him to come over to his house, where Lee showed him a newspaper article about "a marijuana house and a murder," and that Hoskins asked what had happened. Hoskins further testified that he was unaware Lee had a firearm until he spoke with him the next day.

On April 15, 2019, SPD officers arrested Hoskins and brought him in for questioning. Detective Patricia Hayden read Hoskins his Miranda[2] rights, and he confirmed that he understood them. During the course of questioning, Detective Hayden explained that she had surveillance footage and other evidence that suggested Hoskins was at Tam's house. Throughout the nearly five-hour interrogation, Detective Hayden and Hoskins discussed topics including his knowledge that Tam's house contained a cannabis grow operation and his involvement in the burglary of her home. About 65 minutes into the interview, when Detective Hayden prompted Hoskins that a woman had died on the evening of the burglary and that she needed his honesty, the following exchange occurred:

> HOSKINS: I just wanna go home.
>
> DET. HAYDEN: I realize that. She'd wanna go home, but she doesn't have that choice anymore. Who was there with you? Start with that.
>
> HOSKINS: I just wanna go to jail.
>
> DET. HAYDEN: I'm not sure you—you're supposed to be going to jail. That's why I'm askin' for your side of this. I don't wanna put the wrong person in jail. You were there. You know who was there.

Hoskins informed Detective Hayden that he had "every intention of leavin[g]" the police station and that he did not know what happened to Tam or what "went wrong." Eventually, Hoskins divulged what he knew about the events that had taken place.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

The State charged Hoskins with murder in the first degree predicated on burglary in the first degree during which he or one of his fellow participants caused the death of Kam Tam in violation of RCW 9A.32.030(1)(c) (felony murder). The jury convicted Hoskins as charged and also returned a special verdict finding that Hoskins was armed with a firearm at the time of this crime.

The court sentenced Hoskins to 471 months of incarceration and imposed a $500 VPA. Hoskins timely appeals.

## DISCUSSION

Hoskins challenges the following on appeal: (1) the trial court's refusal to provide a lesser included offense instruction to the jury; (2) the trial court's answer to a jury question as an impermissible comment on the evidence; (3) the trial court's admission of his statements to police officers; (4) the trial court's use of his juvenile adjudications in calculating his offender score; and (5) the trial court's imposition of the VPA despite his indigency.

I.      Denial of Lesser Included Offense Instruction

At trial, Hoskins requested a lesser included offense jury instruction that stated, "If, . . . you are not satisfied beyond a reasonable doubt that the defendant is guilty of Burglary in the First Degree, then you will consider if the defendant is guilty of a lesser crime of Burglary in the Second Degree." He also sought an instruction for criminal trespass.[3] However, the court rejected these requested instructions. Instead, it provided a "to convict" instruction only on

---

[3] The following analysis regarding a lesser included instruction for burglary in the second degree also applies to criminal trespass because unlike both of those crimes, as charged here, burglary in the first degree required proof that the defendant was armed with a deadly weapon.

felony murder predicated on burglary in the first degree, as well as an instruction defining burglary in the first degree. The court reasoned it was not "appropriate to instruct the jury on a lesser regarding the burglary charge [because] Mr. Hoskins [was] charged with murder in the first degree – specifically, felony murder," and during Hoskins's interrogation with Detective Hayden, he admitted being at the Tam house, taking cannabis plants, and "knowing that . . . Stanley Lee had a gun with him." Therefore, the court reasoned that "burglary in the second degree, just like criminal trespass, are not lessers to the [charge of] Murder I."

Hoskins contends that he is entitled to a new trial because the trial court erred by refusing to provide the requested lesser included offense instructions. He argues that burglary in the second degree is necessarily an inferior degree of burglary in the first degree, and, therefore, it is a lesser included offense of felony murder in the first degree predicated on burglary, and such instruction is factually supported by the evidence.

RCW 10.61.006 provides that "the defendant may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information."[4] Thus, a defendant is entitled to an instruction for a lesser included offense when (1) all elements of the lesser offense are necessary elements of the charged offense (legal prong) and (2)

---

[4] RCW 10.61.003 provides that "the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto, or of an attempt to commit the offense." A defendant can request an instruction for a lesser *included* offense or a lesser *degree* offense (inferior degree offense). State v. Fernandez-Medina, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000).

The difference between the two instructions is that " '[u]nlike a lesser *included* offense, an [inferior] *degree* offense may have an element that is not an element of the greater offense.' " State v. Coryell, 197 Wn.2d 397, 411, 483 P.3d 98 (2021) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.11 cmt. at 99 (4th ed. 2016) (WPIC)).

where the evidence supports an inference that the lesser offense was committed (factual prong). State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).[5] In other words, "if it is possible to commit the greater offense without having committed the lesser offense, the latter is not an included crime." State v. Berlin, 133 Wn.2d 541, 546 n.1, 947 P.2d 700 (1997) (quoting State v. Frazier, 99 Wn.2d 180, 191, 661 P.2d 126 (1983)). "A lesser offense will seldom satisfy every statutory alternative means of committing the greater offense." Berlin, 133 Wn.2d at 548. Therefore, we apply "the lesser included offense analysis . . . to the offense[] as charged and prosecuted, rather than to the offense[] as [it] broadly appear[s] in [the] statute." Id.

On appeal, the standard of review for jury instructions depends on the basis for the trial court's decision. State v. Condon, 182 Wn.2d 307, 315, 343 P.3d 357 (2015). A trial court's decision based on a factual determination is reviewed for an abuse of discretion, while a legal determination is reviewed de novo. Id. at 315-16. When determining if the evidence was sufficient to support the instruction, the appellate court should view the supporting evidence in the light most favorable to the party that requested the instruction. State v. Henderson, 182 Wn.2d 734, 736, 344 P.3d 1207 (2015). "[A] requested jury instruction on a lesser included or inferior degree offense should be administered 'if the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater.' " State v. Fernandez-Medina, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000) (quoting State v. Warden, 133 Wn.2d 559,

---

[5] The State does not directly respond to Hoskins's argument as to the legal prong under Workman and focuses instead on the factual prong.

563, 947 P.2d 708 (1997)). Thus, we review a determination on the second Workman prong, whether the evidence supports an inference that the defendant committed the lesser offense, for abuse of discretion. Condon, 182 Wn.2d at 316.

Hoskins was charged with felony murder predicated on burglary in the first degree under a theory of accomplice liability. A person is guilty of felony murder, that is, murder in the first degree pursuant to RCW 9A.32.030(1)(c), when they commit a burglary in the first degree and "in the course of or in furtherance of such crime or in immediate flight therefrom, [they], *or another participant*, causes the death of a person." (Emphasis added.)[6] A person is guilty of burglary in the first degree when:

> with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor *or another participant* in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020 (emphasis added). By contrast, a person is guilty of burglary in the second degree when, "if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030.

Hoskins argues that burglary in the first degree and second degree are lesser included offenses to felony murder because burglary in the first and

---

[6] Under this statute, a defendant who is not the only participant in the crime may argue as a defense that they (i) did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and (ii) were not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and (iii) had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and (iv) had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury. RCW 9A.32.030(1)(c)(i)-(iv).

second degrees share the same elements, except for the additional element for burglary in the first degree that the person be "(a) armed with a deadly weapon, or (b) assaults any person." RCW 9A.52.020. Therefore, Hoskins asserts, because all of the elements of burglary in the second degree are necessary to prove burglary in the first degree, they also are necessary to prove the predicate offense for felony murder as charged, so a lesser included offense instruction was required. Hoskins is correct that each of the elements of burglary in the second degree are "necessary element[s]" of burglary in the first degree.

However, under the factual prong of the Workman analysis, the evidence must support an inference "that *only* the lesser offense was committed, to the exclusion of the greater, charged offense." Condon, 182 Wn.2d at 316. Hoskins contends that viewed in the light most favorable to him, there is "some evidence" supporting an inference that he committed only the lesser crime of burglary in the second degree. Specifically, he testified that he had heard there was cannabis at this home and initially did not plan on committing a theft, but once there, he entered the shed and stole cannabis and also called Lee to tell him the Tam home appeared vacant. According to Hoskins, Lee and Cerna arrived separately and tried to break into the house before going to the shed, but Hoskins did not aid them in this endeavor and left after taking cannabis from the shed. Hoskins claims Lee and Cerna did not leave when he did, even though he told them they should go also. He claims he was on his way to his car when he heard a "feminine" voice and a "pow," but did not learn about the shooting or that Lee was armed until the next day.

9

The State responds that even when viewing the evidence in the light most favorable to Hoskins, a jury would not conclude that he committed only burglary in the second degree rather than felony murder because "either Hoskins or an accomplice was indisputably armed with a deadly weapon," which is required for the predicate offense. We agree with the State.

One of the elements required to prove Hoskins committed the predicate crime of burglary in the first degree was that he—or an accomplice in the crime—was armed with a deadly weapon. Though Hoskins knew that Lee was usually armed with a firearm, he claims on the night of the shooting, he did not know Lee had a gun. The State's theory was that Hoskins was an accomplice to Lee, who shot Tam and caused her death in the course of committing burglary in the first degree. To be convicted as an accomplice, the defendant need not have knowledge of each element of the principal's crime. State v. Roberts, 142 Wn.2d 471, 513, 14 P.3d 713 (2000). When an accomplice agrees "to participate in a criminal act, [they] run[] the risk of having the primary actor exceed the scope of the preplanned illegality." State v. Davis, 101 Wn.2d 654, 658, 682 P.2d 883 (1984) (affirming conviction for first degree robbery despite defendant's asserted lack of knowledge that the principal was armed with a deadly weapon, because such knowledge was not needed to prove accomplice liability). Thus, the defendant need not know that the principal is carrying a weapon to be convicted as an accomplice to burglary in the first degree.

Nevertheless, Hoskins argues that when there is some evidence to show that the defendant "committed a predicate felony but was not involved in that

offense at the time [the] death occurred," they are entitled to a lesser included offense instruction, citing State v. Lyon, 96 Wn. App. 447, 450-52, 979 P.2d 926 (1999). In Lyon, the defendant admitted to assaulting the victim and was charged with murder in the second degree of the victim, but requested an instruction for assault in the second degree based on his evidence that a different person proximately caused the victim's death. 96 Wn. App. at 449. The trial court refused to give the assault in the second degree instruction. Id. We reversed the trial court, holding that while felony murder cases typically do not satisfy the factual prong of Workman, the jury could have concluded that the victim's death resulted from an assault by an unrelated third party and not the defendant's assault of the victim. Id. at 450-51. Therefore, we held that the court erred by refusing the lesser included instruction for assault in the second degree. Id. at 451.

Hoskins's reliance on Lyon is misplaced. Unlike in Lyons, where the evidence indicated that the victim's death may have been caused by a third party during a separate assault from the one to which Lyon admitted, here, the evidence does not support an inference that Tam was killed during a separate, unrelated burglary committed by someone other than Hoskins or an accomplice. Rather, Hoskins admitted he unlawfully entered Tam's backyard and shed and called Lee to tip him off that no one appeared to be at the home. He also admitted to being at Tam's house with Lee and Cerna and that they all stole cannabis from the shed. Hoskins further testified that he saw the motion-activated light and heard a woman's voice, then heard a "pow" as he was going

to his car. To be liable as an accomplice, a person " 'need not be physically present at the commission of the crime . . . [if the accomplice] did something in association with the principal to accomplish the crime.' " State v. Jackson, 137 Wn.2d 712, 731, 976 P.2d 1229 (1999) (quoting State v. Boast, 87 Wn.2d 447, 455-56, 553 P.2d 1322 (1976)). No rational jury could find from this evidence that Hoskins committed his own separate burglary rather than act in association with Lee, when after Hoskins arrived at Tam's home, he called Lee, and Lee and Cerna joined him in entering Tam's shed and removing cannabis plants. By agreeing to participate in the burglary, Hoskins "r[a]n[] the risk of having [Lee] exceed the scope of the preplanned illegality." Davis, 101 Wn.2d at 658.

We conclude that Hoskins failed to present some evidence upon which a jury could rationally find that he committed only the lesser crime of burglary in the second degree or criminal trespass, and, therefore, was not an accomplice to burglary in the first degree as a predicate for felony murder. The trial court did not err in refusing to grant Hoskins's request for a lesser-included instruction.[7]

II.      Court's Answer to Jury Question

Hoskins argues that the trial court impermissibly commented on the evidence in violation of article IV, section 16 of the Washington Constitution when it answered a jury question that included factual information that was for the jury to resolve. He further contends that because this error was not harmless, he is

---

[7] Hoskins makes two tangential arguments. First, he implies that because he ended his involvement and did not expect violence he could not be convicted of burglary in the first degree. Hoskins does not provide authority to support this argument, so we need not consider it. RAP 10.3(a)(6). Second, Hoskins suggests that although he did not request it, his case would have satisfied the statutory defense to felony murder, because he was not armed, did not encourage violence, and ended his involvement before a death occurred. But Hoskins did not assert this statutory defense at trial. Therefore, we do not consider it on appeal. RAP 10.3.

entitled to a new trial.

A judge is not permitted to "charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. Additionally, a judge impermissibly comments on the evidence when they convey "a personal attitude toward the merits of the case," such that the jury can infer that the judge believed the evidence or testimony. State v. Ratliff, 121 Wn. App. 642, 646, 90 P.3d 79 (2004). Judges are also prohibited from "instructing a jury that 'matters of fact have been established as a matter of law.' " State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). So, a comment that "has the potential effect of suggesting that the jury need not consider an element of an offense" could constitute an impermissible judicial comment. Id.

For example, in Becker, the trial court gave the jury a special verdict form that stated that a particular facility was a "school," for purposes of a sentencing enhancement. 132 Wn.2d at 65. Given that the defendant had presented "considerable evidence" that the facility was not a "school," id. at 58, the Washington Supreme Court held that the special verdict form was an improper comment on the evidence because it removed a disputed issue of fact from the jury's consideration. Id. at 65.

However, when a jury instruction is merely an accurate statement of the law, it is not an impermissible comment. State v. Brush, 183 Wn.2d 550, 557, 353 P.3d 213 (2015). For example, in State v. Jain, we held that a jury instruction stating that " 'Specified unlawful activity' means the commission of the crime of

Delivery of a Controlled Substance" was not an impermissible comment on the evidence. 151 Wn. App. 117, 130, 210 P.3d 1061 (2009). Rather, it was a straightforward legal instruction that did not "direct the jury to find that specified unlawful activity had occurred, only that the specified unlawful activity at issue . . . was delivery of a controlled substance." Id. Similarly, in State v. Frederick, the trial court did not impermissibly comment on the evidence by answering "no" to a jury question that asked, "Does the law preclude a knife of less than three inches of being a deadly weapon?" 32 Wn. App. 624, 625-26, 648 P.2d 925 (1982). We reasoned that because the response "was legally correct" and "suggested no additional or improper meaning," it was not improper. Id. at 626.

Here, while the jury was deliberating, it submitted a written question to the court asking, "In reference to [jury] instruction no. 8, is it a crime to steal mariju[a]na when it is illegal to grow and pos[s]ess in your home?" Instruction No. 8 stated, "A person commits the crime of burglary in the first degree when he or she enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, that person or an accomplice in the crime is armed with a deadly weapon." The State asked the court to respond "yes," arguing that this question was a legal question and that it was permissible for the court to answer. Hoskins asked the court simply to refer the jury to their instructions. He argued that the jury was trying to make a factual determination about whether the act was a theft and that responding "yes" was "relieving [the State] of its

14

function"—i.e., its burden to prove each element beyond a reasonable doubt. The court followed the State's suggestion and responded "yes," reasoning that it was its duty to "ensure that the jury understands the law" and that referring the jury back to its instructions was not sufficient when the jury misunderstands the law.

On appeal, Hoskins argues that whether he committed a burglary, including whether he had the intent to steal cannabis, was a central issue for the jury to determine, pointing in support to the prosecutor's question to Hoskins on cross-examination, "So you know it's not likely that the owners of a marijuana grow operation are going to call the police about someone trying to steal their marijuana, correct?" By contrast, the State argues that the trial court's response to the jury's question was "a neutral, accurate statement of the law" and that in the context of the whole case, because it was undisputed that stealing illegally grown cannabis is a crime, the court's answer did not promote the State's theory of the case.

We agree with the State. The court's response to the jury question was a legally correct response to a legal question. While the jury question itself asked, "is it a crime to steal mariju[a]na when it is illegal to grow and possess [it] in your home," the factual question for the jury to determine, as stated in instruction no. 8, was whether Hoskins "enter[ed] or remain[ed] unlawfully in a building with intent to commit a crime against a person or property therein." Like the special verdict form in Jain, 151 Wn. App. at 130, the jury's question here did not "direct the jury to find that specified unlawful activity had occurred," but rather, that stealing cannabis was the specified crime that the State alleged Hoskins had the

15

intent to commit. As in Frederick, 32 Wn. App. at 625-26, where the jury's question mentioned a fact that was not required to be proven—a blade of less than three inches—here, the response "was legally correct" and "suggested no additional or improper meaning." Answering "yes" did not suggest that the State was required to prove that it was illegal for Tam to grow and possess cannabis in the shed.

In sum, while the jury's question referenced facts from the case—"illegally grown marijuana"—the trial court's response was a correct statement of the law: it is a crime to steal cannabis, regardless of whether it is legally grown. We hold that the court's answer to the jury's question was not an impermissible comment on the evidence.

III.     Right to Remain Silent

The trial court concluded that Hoskins did not unequivocally invoke his right to remain silent and made a voluntary, knowing, and intelligent waiver of those rights and admitted statements he made to Detective Hayden.

Hoskins argues that he is entitled to a reversal of his conviction because he indicated he wished to cease the interrogation, so the trial court improperly admitted his subsequent statements. Specifically, he argues that both the federal and state constitutions require police to honor a detained person's expressed desire to stop the interrogation, and the police failed to do so here. He further argues that article I, section 9 of the Washington Constitution goes beyond the federal constitution and requires police to clarify and honor an invocation of a

detained person's right to remain silent, which in this case, the State did not do. We disagree and hold that the trial court did not err by admitting his statements.

The federal constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Thus, when a person is subject to a custodial interrogation they must be advised of the constitutional right to remain silent. Miranda, 384 U.S. at 479. Once the detained person asserts their right to remain silent, the interrogation must stop. Id. at 473-74. If the police fail to "scrupulously honor" the detained person's invocation, the government cannot use any statements made after the invocation against them. Michigan v. Mosley, 423 U.S. 96, 103, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

A detained person must unambiguously invoke their right to remain silent for these protections to flow. Berghuis v. Thompkins, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). The right to remain silent can be invoked by remaining silent "in the face of repeated questioning over a period of time," when "under the totality of the circumstances, the invocation is clear and unequivocal." State v. Hodges, 118 Wn. App. 668, 671-73, 77 P.3d 375 (2003). An invocation of the right to remain silent is unequivocal when a "reasonable police officer in the circumstances" would understand it as such. State v. Piatnitsky, 180 Wn.2d 407, 411-13, 325 P.3d 167 (2014) (quoting Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). When evaluating whether an invocation was unambiguous, it is necessary that courts consider the plain language of the statement and the circumstances of the alleged invocation.

Smith v. Illinois, 469 U.S. 91, 98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). But if the detained person makes an equivocal or ambiguous statement, the police are not required to clarify if they intended to invoke or end the interrogation. Berghuis, 560 U.S. at 381 (holding that a detained person's statement that they "did not want to talk" would be a sufficient invocation).[8]

Additionally, a detained person can waive the right against self-incrimination when such waiver is voluntary, knowing, and intelligent. Miranda, 384 U.S. at 444. We review whether a defendant unequivocally invoked his right to remain silent de novo because it is a mixed question of law and fact. State v. Rankin, 151 Wn.2d 689, 709, 92 P.3d 202 (2004).

Hoskins contends that he expressed his desire to cease the interrogation by stating "I just wanna go home," and "I just wanna go to jail" in response to being questioned by Detective Hayden, but that this invocation was not honored. He asserts that his statements "I just wanna go home," "I just wanna got to jail," "I just wanna go ma'am," and "I ain't got nothin' else to say ma'am" all indicate that he wanted to remain silent. Further, he argues that he began to answer questions only because Detective Hayden failed to scrupulously honor his invocations and made it clear that he could not end the interrogation or leave

---

[8] Hoskins argues in the alternative that an analysis under State v. Gunwall, 106 Wn.2d 54, 65, 720 P.2d 808 (1986), leads to the conclusion that article I, section 9 of the Washington Constitution, which protects a person from being compelled "to give evidence against [them]," is more protective than the federal constitution. Hoskins contends that he "repeatedly convey[ed] his desire to go home, or go to jail," which indicated his intent to cease questioning, and that under the article I, section 9, Detective Hayden was permitted only to clarify this invocation. But our state Supreme Court has held that the protection provided by article I, section 9 "is coextensive with that provided by the Fifth Amendment." State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008); see also State v. Mendes, 180 Wn.2d 188, 194, 322 P.3d 791 (2014) ("we interpret these two constitutional provisions consistently") (citing Unga, 165 Wn.2d at 100). Therefore, no Gunwall analysis is necessary here.

without answering her questions. He also claims that under <u>Mosley</u> and <u>Rhode Island v. Innis</u>, the police had a duty not to attempt to elicit or encourage him to make additional comments or incriminating responses, and it did not satisfy this duty. <u>See</u> <u>Mosley</u>, 423 U.S. at 100 (explaining that <u>Miranda</u> bars any form of compulsion); <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (noting that <u>Miranda</u> protections can extend to words or actions that were reasonably likely to elicit an incriminating response).

The State contends Hoskins did not unambiguously invoke his right to silence because his statements were equivocal and the police did not have an obligation to explore equivocal statements to determine if he was invoking his right to remain silent. We agree with the State.

Here, under the objective standard outlined in <u>Piatnitsky</u>, 180 Wn. 2d at 411-13, a reasonable officer in the circumstances likely would not have understood Hoskins's statements "I just wanna go home," or "I just wanna go to jail," as an unambiguous invocation of his right to remain silent. At the CrR 3.5 hearing, Detective Hayden testified that Hoskins was "articulate enough in this interview" to have invoked his right to remain silent "if that's what he wanted to do." She further testified that she did not interpret Hoskins's statement that he wanted to go home as an indication that he did not want to speak with her.

In the trial court's unchallenged findings after the CrR 3.5 hearing,[9] it found that Hoskins was advised of and confirmed his understanding of his

---

[9] Hoskins does not challenge the trial court's findings of fact, so they are verities on appeal. <u>State v. O'Neill</u>, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (unchallenged findings are verities on appeal).

Miranda rights and that "[w]ithout requesting an attorney Mr. Hoskins voluntarily continued answering [Detective Hayden's] questions." Further, it found that although Hoskins made statements to the effect of "I just wanna go home," he never asked for an attorney and "did not cease speaking with Det. Hayden but instead remained engaged in the conversation and continued to answer questions." Additionally, the trial court found that the only time Hoskins stated that he had nothing else to say was after Detective Hayden left the room and that nothing indicated she heard the statement.

The interrogation transcript reveals that Detective Hayden and Hoskins were discussing his whereabouts on the night of Tam's death for over an hour before he first stated, "I just wanna go home," and "I just wanna go to jail." Three minutes later Hoskins again said, "I just wanna go home." Hoskins then proceeded to answer Detective Hayden's questions about the crime and the other participants for more than two hours before he said, "I just wanna . . . go on my way," and "I wanna go home to my wife." Then Hoskins again continued to answer clarifying questions for nearly forty minutes until Hayden left the room. At that point, although Detective Hayden was not present, Hoskins stated, "I ain't got nothin' else [to] say ma'am." However, several minutes later when Detective Hayden re-entered the room, Hoskins did not repeat his statement that he had nothing else to say, but again answered her clarifying questions for nearly 35 minutes until Detective Hayden concluded the interview. We hold that given the trial court's unchallenged CrR 3.5 findings, Hoskins knowingly and voluntarily waived his Miranda rights by responding to questions, and did not

unambiguously invoke his right to remain silent. Further, according to Berghuis,
560 U.S. at 381, Detective Hayden was not required to clarify his equivocal
statements expressing the desire to go home. Therefore, the court did not err by
admitting evidence of Hoskins's statements during the interview with Detective
Hayden.

IV.        Juvenile Adjudications in Calculating Offender Score

When the trial court calculated Hoskins's offender score, it counted
Hoskins's eight juvenile adjudications. Hoskins argues that a recent change in
the law that bars courts from using juvenile adjudications to calculate an adult
offender score applies, so he is entitled to a resentencing hearing. We disagree.

On appeal, we review the calculation of an offender score de novo. State
v. Schwartz, 194 Wn.2d 432, 439, 450 P.3d 141 (2019). The legislature recently
amended RCW 9.94A.525 to provide that effective July 23, 2023, Title 13 RCW
(juvenile adjudications), "which are not murder in the first or second degree or
class A felony sex offenses," must not be considered in calculating an adult
offender score. LAWS OF 2023, ch. 415, § 2. "Sentences imposed under the
[Sentencing Reform Act (SRA)] of 1981, ch. 9.94A RCW, 'are generally meted
out in accordance with the law in effect at the time of the offense. See
RCW.9.94A.345; RCW 10.01.040.' " State v. Troutman, 30 Wn. App. 2d 592,
598, 546 P.3d 458 (quoting State v. Jenks, 197 Wn.2d 708, 714, 487 P.3d 482
(2021)), review denied, 3 Wn.3d 1016, 554 P.3d 1217 (2024).

This court has held that the amendment to RCW 9.94A.525 does not
apply retroactively and that "under the SRA, RCW 9.94A.345, and the savings

21

clause, RCW 10.01.040, the law in effect at the time of the offense applies to [a defendant's] sentence." Troutman, 30 Wn. App. 2d at 599-600. Based on Troutman, we reject Hoskins's claim that the amended RCW 9.94A.525 applies. Because Hoskins's offense was committed in 2018, the law at the time of his sentence required the trial court to count juvenile adjudications in calculating his offender score.

V.      VPA

Hoskins requests that we strike the VPA because he is indigent, and RCW 7.68.035 prohibits courts from imposing the VPA when the defendant is indigent pursuant to RCW 10.01.160(3). The State does not object. The 2023 amendment to RCW 7.68.035 took effect on July 1, 2023. LAWS OF 2023, ch. 449, § 1. The 2023 amendment, RCW 7.68.035(4), applies to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). We therefore remand to strike the VPA from Hoskins's judgment and sentence.

CONCLUSION

We affirm Hoskins's conviction, but remand to strike the VPA from his judgment and sentence.

_Chung, J._

WE CONCUR:

_Coburn, J._       _Hazelrigg, ACJ_